## NORWEGIAN NITROGEN PRODUCTS CO. v. UNITED STATES.

No. 272. Argued January 10, 11, 1933.—Decided February 6, 1933.

*Mr. Marion De Vries*, with whom *Messrs. Jesse P. Crawford* and *H. Kennedy McCook* were on the brief, for petitioner.

*Solicitor General Thacher,* with whom *Assistant Attorney General Lawrence* and *Mr. Robert P. Reeder* were on the brief, for the United States.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

On May 6, 1924, the President of the United States determined and proclaimed that an increase in the rate of duty on sodium nitrite was necessary to equalize the differences in the cost of production in the United States and the principal competing country, Norway, and that to that end the duty should be increased from 3 cents per pound to 4½ cents per pound. The proclamation was made after an investigation and report by the United States Tariff Commission under the flexible tariff provisions of the Tariff Act of 1922. Tariff Act of September 21, 1922, c. 356, § 315, 42 Stat. 858, 941–943. After the new rate of duty had thus gone into effect, there were new importations of sodium nitrite at the port of New York. The duty was assessed by the customs officers in accordance with the proclamation; and protests were filed by the petitioner, which is the exclusive agent within the United States of the leading exporter to this country of the commodity affected. The protests were made upon the ground that the Tariff Commission in investigating the costs of production in the United States and Norway had not given the petitioner the hearing prescribed by the statute, and that all that followed was of no validity. A judgment of the Customs Court overruling the protests (T. D. 44,824, 59 Treas. Dec. 921) was affirmed by the Court of Customs and Patent Appeals. 20 C. C. P. A. (Customs) 27; T. D. 45,674. A writ of certiorari brings the case here.

In October, 1922, the American Nitrogen Products Company submitted to the Tariff Commission a request for a report and recommendation to the President that the duty on sodium nitrite be increased fifty per cent. It

stated in this request that with every reasonable effort to economize it had been unable to compete with the foreign manufacturers and had been forced to close its plant. In response to this request, the Commission on March 27, 1923, ordered that an investigation be made, declared that a public hearing would be held on a date thereafter to be fixed, and gave public notice of its order. The Commission then proceeded to the business of investigation. From the chief producers of sodium nitrite in the United States (the American Nitrogen Products Company and another) the agents of the Commission received the fullest measure of disclosure as to the costs of production and other details of the business. The information as to costs was subject to a pledge of secrecy, the manufacturers taking the position, to which the Commission acceded, that costs were trade secrets, to be withheld from competitors. The chief foreign producers were two, the Norsk-Hydro, a Norwegian company, represented by the petitioner, and the Badische-Anilin of Germany. Both foreign producers refused to supply the investigators for the Commission with any statement of costs, or to permit access to their records. The Norwegian company wrote afterwards in a cablegram to the petitioner: "On principle we always refuse publish cost price, consequently did not furnish investigators any information enabling them calculate cost price." The Commission was hindered, but not baffled. Its investigators went to Norway and consulting other sources of information made an estimate of cost as best they could. By July 20, 1923, the preliminary investigation was over, and the Commission was ready for a public hearing. It gave public notice on that date that on September 10, 1923, all parties interested would be given an opportunity to appear before the Commission, to produce evidence and to be heard with regard to differences in the cost of sodium nitrite and any other facts and conditions affecting the inquiry.

At the time thus appointed, the petitioner appeared, represented by its counsel. It made a motion at the beginning that it receive a complete copy of the request or application for an increase of rates. The copy already furnished to it was not complete, in that the details of the costs of production at the applicant's factory had been left out. The president of the applicant protested that the information as to costs had been given under a promise to hold it confidential, and the chairman of the Commission thereupon assured him that the promise would be kept. The request of the importer was accordingly refused. The hearing then proceeded, the president of the American Nitrogen Products Company appearing as a witness. He gave general information as to the state of the industry, showing by his testimony that the foreign producers were selling their product in this country at a lower price than they were selling it in their home markets, and showing also that by reason of a difference in the manufacturing process in this country and abroad the foreign producers were able to manufacture sodium nitrite as a by-product, and thus to dispose of it far more cheaply than was possible here. A change of the domestic plant in adaptation to the foreign process would involve prohibitory expense. Counsel for the importer was allowed to cross-examine as to everything brought out at the public hearing. He was not allowed, however, to extract from the witness a statement of the costs of production, the witness again protesting that disclosure of these costs, though it had been made to the Commission in the preliminary investigation, ought not to be made in public for the use of a competitor. At the end of the examination, there was an adjournment of the hearing until September 26.

In the interval, there were other happenings that bear on the merits of the controversy. On September 15, 1923, the Commission made public a report or summary of its

information, still omitting, however, any statement as to the costs of production at the applicant's domestic plant. On September 11, it received a letter from the importer's counsel renewing his demand for a complete copy of the application and demanding at the same time that " every particle of evidence gathered by the Commission or its representatives " be submitted to his inspection, and that he be accorded the privilege of examining any and all witnesses, including the field agents of the Commission, with reference thereto. On September 24, the Commission wrote to counsel refusing his request for a disclosure of " every particle of evidence," but stating that the American Nitrogen Products Company had agreed to disclose its cost of production data if the opposition, the Norwegian Nitrogen Products Company, would furnish cost data for the Norwegian product. The importer did not accept this offer. It did not present any excuse for failing to accept it. It did not even state that it had made any effort to induce its principal abroad to supply it with the necessary data. It paid no attention to the suggestion that disclosure should be mutual, and stood upon its rights, whatever they might be.

On September 26, the hearing went on again. Counsel for the importers submitted copies of cablegrams exchanged between his client and its Norwegian principal. The cablegram from the client informed the principal of the estimate of costs of production in Norway contained in the summary prepared by the Commission. The answering cablegram stated that the estimate was far too low, but confirmed the report of the investigators that information had been refused on the ground that the costs were confidential. That part of the cablegram has been quoted already. The chairman, responding to a request for an adjournment of thirty days, made inquiry of counsel whether definite figures would be obtained from Nor-

way in return for the extension. To this counsel retorted that he was not offering any consideration, nor joining in any barter, but "relying strictly upon the statute." The outcome of the colloquy was an order for an adjournment until October 6. Before this adjournment was taken, counsel submitted five separate requests. Request number one was that his client "have reasonable opportunity to inspect and to be heard upon all evidence which has been offered in this case, not deemed by the Commission trade secrets, or not, in fact, trade secrets." Request number two was to inspect and to be fully heard upon "all the evidence in the possession of the Commission as to the cost of power in the United States in the production of nitrite." Number three was a like request with reference to the number of laborers employed by the American Nitrogen Products Company and the wages paid. Number four was a like request with reference to the capital invested in its plant. Number five was a request that the experts of the Commission be produced for cross-examination with reference to the information collected by them in the course of the inquiry, and that the importer be permitted to offer testimony and to be heard in opposition thereto.

At the adjourned hearing on October 6, the Commission announced its ruling with reference to these requests, notice of the ruling having been previously conveyed to counsel for the importer. The decision was in substance that data gathered by the Commission with the understanding that they were to be treated as confidential would be withheld; that the investigators working for the Commission would not be required to produce such data or to be cross-examined about them; but that as to all these subjects of inquiry the importer would be permitted to offer any evidence that it was able to present, and to be heard in oral and written argument with reference thereto.

Upon the announcement of this ruling, counsel for the importer stated that he would offer no testimony on behalf of his client but would thereafter file a brief.

On December 12, 1923, before the Commission had reported to the President, the petitioner applied to the Supreme Court of the District of Columbia for a writ of mandamus directing the Commission to disclose the information sought. The petition was dismissed, the court ruling that the action of the Commission had been in conformity with law. An appeal to the Court of Appeals followed, but while it was pending the Commission made a report to the President, and upon the basis of that report the President issued his proclamation for an increase of the duty. The Court of Appeals expressed an opinion, not called for by its judgment, that the information should have been given. It decided, however, that the petition had become moot by force of the action of the President, 6 F. (2d) 491, and so did this court. *U. S. ex rel. Norwegian Nitrogen Products Co.* v. *United States Tariff Commission*, 274 U. S. 106. The stages through which the controversy has come to us again have already been described.

The Tariff Act of 1922 (c. 356, § 315; 42 Stat. 858, 941) gives authority to the President to increase or decrease the rates of duty specified in the act if he finds upon investigation that increase or decrease is necessary in order to equalize the differences in the cost of production in the United States and elsewhere. It provides, § 315 (c), that in ascertaining these differences, " the President, in so far as he finds it practicable, shall take into consideration (1) the differences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3)

advantages granted to a foreign producer by a foreign government, or by a person, partnership, corporation, or association in a foreign country; and (4) any other advantages or disadvantages in competition." This provision is followed by others designed to give protection against hasty or ill-considered changes. There shall be no proclamation under the authority of the statute until an investigation to assist the President has been made by the United States Tariff Commission, which is " authorized to adopt such reasonable procedure, rules and regulations as it may deem necessary." Coupled with these general directions is a mandate more particular which is the petitioner's chief reliance. " The commission shall give reasonable public notice of its hearings and shall give reasonable opportunity to parties interested to be present, to produce evidence, and to be heard." § 315 (c).

The decision of this case hinges upon our answer to the question whether the petitioner has been " heard " in accordance with the statute. Does the requirement of a hearing mean that every producer or importer affected by a tariff may explore at will the data collected by the Commission as to the capital, the wages, the cost of material and manufacture, in the business of any other person similarly affected, and may cross-examine investigators and competitors upon the data thus laid bare? If something less than this is exacted, is there still a minimum of disclosure without which the purpose of the hearing will be thwarted altogether, and was this minimum attained by what was done by the Commission here?

1. History, analogy and administrative practice point with sureness to the conclusion that letters of marque have not been issued to every producer or importer affected by a tariff to capture knowledge of the business of every rival so affected in all the intimate details uncovered to the investigating officers.

The appeal to history is a threefold one: to the history of the process of tariff-making by Congress and congres-

sional committees; to the history of this statute in its progress through the Houses; and to the history of this investigating commission and of others that came before.

The process of tariff-making by Congress and congressional committees is not different in essentials from that for legislation generally. If the bill has gone to a committee, the practice has been general to give the privilege of a hearing to business men and others affected by its provisions. The hearing is not one that may be demanded as of right. A change of the tariff laws like a change of any other statute is not subject to impeachment on the score of invalidity though notice to those affected has been omitted altogether. Luce, Legislative Procedure, p. 143, cf. *Buttfield* v. *Stranahan*, 192 U. S. 470. Even so, the privilege is now so fortified by practice that it may fairly be taken for granted. But the hearing when given is not similar to a trial as conducted in a court. The proponents of a bill and the contestants make their statements for and against, bringing forward such confirmatory documents, trade journals, letters, governmental reports, and what not, as they believe to be important. The kind of information thus supplied can be gathered from the proceedings of the committees that reported the tariff act in question, the Act of 1922, as well as from those leading up to the tariff acts of other years. In none of these congressional hearings has the practice ever prevailed of permitting the advocates of a measure to cross-examine the opponents, or the opponents the advocates, or of compelling the committee itself to submit to an inquisition as to data collected by its members through independent investigation. The committee determines for itself whether its sessions shall be public or private. " Investigations [in Congress] often proceed behind closed doors, for the manifest reason that otherwise some witnesses would not be frank, perhaps would not attend, putting themselves if

possible beyond the reach of the committee." Luce, Legislative Procedure, p. 144. It is all a matter of discretion. What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the legislative process. *Hampton & Co.* v. *United States,* 276 U. S. 394; *Buttfield* v. *Stranahan, supra; Field* v. *Clark,* 143 U. S. 649. The inference is, therefore, a strong one that the kind of hearing assured by the statute to those affected by the change is a hearing of the same order as had been given by congressional committees when the legislative process was in the hands of Congress and no one else. To be sure there has been a change of sanction. What was once a mere practice has been converted into a legal privilege. But the limits of the privilege were not meant to be greatly different from those of the ancient practice that had shaped the course of legislation.

We have said that the inference is a strong one, yet, of course, it is far from conclusive and might even be inadequate if it were considered by itself. The history of the statute as it passed through the two Houses of the Congress supplies confirmatory evidence. The bill in its early stages empowered the President to change tariff rates, but said nothing whatever as to the manner in which the preliminary investigation should be made. 62 Cong. Rec., pt. 7, p. 7108, pt. 11, pp. 11,155, 11,156, 11,193. A letter from President Harding to the chairman of the Finance Committee of the Senate recommended that Congress name the Tariff Commission as the source of information and recommendation upon which the President might proclaim a change. 62 Cong. Rec., pt. 11, p. 11,211. Several amendments embodying this recommendation were proposed in each chamber of the Congress. Nowhere in the long debates that followed is there a suggestion by any one that witnesses or others appearing in the

inquiry should be heard in any other way than according to the customary procedure for investigating bodies. The first amendment named the Tariff Commission as the investigator, but gave no directions as to the mode of action. 62 Cong. Rec., pt. 11, pp. 11,229, 11,232. A second provided that the Commission "shall give such opportunity as it deems proper for the presentation of material facts in each case and arguments thereon." 62 Cong. Rec., pt. 11, p. 11,229. These provisions aroused the fear that at times there might be no hearing, or hearings at which only one side would be permitted to appear. 62 Cong. Rec., pt. 11, p. 11,231. A third amendment, proposed in the Senate, recast the statute by providing that " the Commission shall give reasonable public notice and shall give reasonable opportunity to parties interested to be present and to produce evidence and to be heard," which is in the statute as enacted, and by providing also " said hearings shall be public " and the President shall publish with his findings " the hearings and testimony." 62 Cong. Rec., pt. 11, pp. 11,231, 11,232. These last provisions were omitted in conference, and the section was thus amended to read as it stands today. 62 Cong. Rec., pt. 12, p. 12,627. The omission may have been unwise, but it certainly was not inadvertent. The managers on the part of the House reported (62 Cong. Rec., pt. 12, p. 12,660) : " The action of the conferees eliminates the provision of the Senate amendment that the Tariff Commission hearings shall be public and that the President shall make the findings, hearings and testimony in all proceedings public as soon as practicable after the issuance of a proclamation." The change was criticized in the Senate (62 Cong. Rec., pt. 12, p. 12,888) but in the face of the criticism it was written into the law.

If Congress was unwilling to prescribe a requirement that the " hearings shall be public," or that the President shall publish the testimony when announcing his decision,

it is hard to believe that it intended every member of the public affected by an increase or decrease of the duty to inspect and copy all the records and data collected by the Commission, and to cross-examine the investigators as well as the producers or importers appearing at the hearing.. If a privilege so far-reaching was to be accorded as a matter of right, there would be a publicity far greater than any that would result from throwing the doors of the hearings open to all who wished to enter. By the Revenue Act of 1916 (c. 463, § 706, 39 Stat. 756, 797), the Commission and its agents are given access to any document pertinent to the subject matter under investigation in the possession of any one engaged in the production, importation or distribution of the commodity affected, with power to inspect and copy, to summon witnesses and to administer oaths. If the hearings are to have the scope for which the petitioner contends, all this information is subject to the call of every business rival, unless it comes within the description of " trade secrets or processes." Revenue Act of 1916, § 708. It happens in this case that the number of competitors is small. Cases may arise in which it will mount into the hundreds. Any one of these competitors will be free, in the view of the petitioner, to pry without hindrance into the business of the others, for everything collected by the Commission will have the quality of a public record. Not only will there be a privilege to inspect whatever is of record, but the process, it is said, may be carried even farther, by examination and cross-examination as to whatever is thus discovered. The statute does not say that the parties affected by the duty may be present during the preliminary investigation by the agents of the Commission. They are to be present at a hearing, which may be public or private as the Commission shall determine. The statute does not say that they are to have an opportunity to produce evidence and to be heard to whatever extent they may desire. It says

that they are to have a reasonable opportunity, and this subject to the power of the Commission to adopt such reasonable procedure, rules and regulations as it may deem necessary. Nothing in the statute suggests a belief of the lawmakers that every producer or importer is to be viewed, like a party to a lawsuit, as the adversary of every other, with the privilege of examination and cross-examination extended through the series. "There must be a limit to individual argument in such matters if government is to go on." Holmes, J., in *Bi-Metallic Co.* v. *Colorado*, 239 U. S. 441, 445.

Our discussion of the significance of history as an aid to the construction of the statute will be inadequate if it is confined to the history of hearings by congressional committees and to the amendments of the bill in its progress through the Houses. There is need to consider also the history of this Commission before the Act of 1922, and that of earlier commissions organized for kindred purposes.

The powers of the President under the flexible tariff provisions of the Act of 1922 differ in degree rather than in kind from powers that have long been his. By an act of March 3, 1815 (3 Stat. 224), the President was empowered to give effect to a repeal of duties upon imports whenever he was "satisfied that the discriminating or countervailing duties" of the foreign nation affected, "so far as they operate to the disadvantage of the United States" had been abolished. See *Field* v. *Clark*, 143 U. S. 649, 685. Powers very similar were conferred in later years. See, e. g., Act of March 3, 1817, c. 39, 3 Stat. 361; Act of January 7, 1824, c. 4, 4 Stat. 3; Act of May 31, 1830, c. 219, 4 Stat. 425; Act of June 26, 1884, c. 121, 23 Stat. 57; *Field* v. *Clark, supra*, pp. 686, 689.[1] The Tar-

---

[1] For other instances see Comer, Legislative Functions of National Administrative Authorities, pp. 64, *et seq.*

iff Act of 1890 went farther than those before it. Whenever the President became satisfied that the government of any country producing and exporting certain enumerated articles had imposed duties upon the agricultural or other products of the United States which he found to be reciprocally unequal and unreasonable, he was to have power to suspend the provisions of the tariff law whereby importation of the enumerated articles had previously been free. 26 Stat. 567, 612, c. 1244. Broader still was the delegation of power under the Tariff Act of 1909, which set up a system of maximum and minimum rates with permission to the President to adopt the one set or the other. 36 Stat. 11, 82, c. 6. Under none of these statutes was executive action conditioned upon an inquiry and report by any officer or department. In the fulfilment of his duties, the President consulted whatever sources of information appeared to be appropriate, and when satisfied as to the facts, made proclamation of his action.

The first statute for the appointment of a commission to deal with the problem of the tariff was enacted in 1882. 22 Stat. 64, c. 145. See F. W. Taussig, Tariff History of the United States, 8th edition, p. 231. The Commission, which was to be an investigating body merely, was established as an aid to Congress rather than the President. It was to report at the next session of Congress what changes it thought desirable. After the expiration of its life neither President nor Congress received official aid that was more than desultory or occasional till a body styled the Tariff Board was organized by President Taft in 1909. Taussig, *supra,* pp. 405, 481. This board was established under a provision of the Tariff Act of that year, which by § 2 gave the President a choice between two sets of duties, a maximum and a minimum. " To secure information to assist the President in the discharge of the duties imposed upon him by this section, and the

officers of the government in the administration of the customs laws, the President is hereby authorized to employ such persons as may be required." 36 Stat. 83, c. 6. The function of the new board was to investigate and advise. See Taussig, *supra*, p. 424.

The Tariff Board went down at the end of 1912 through the failure of the Congress to provide the ways and means. Taussig, *supra*, 424, n. 1. No similar body was created till the organization of the present Tariff Commission in 1916. Act of September 8, 1916, c. 463, §§ 700, 702, 703, 706, 707; 39 Stat. 756, 795, 796, 797; 19 U. S. Code, §§ 91, 96, 97, 100, 101. Cf. Taussig, *supra*, p. 481. The function of the Commission as first organized was to investigate the administration and fiscal and industrial effects of the customs laws of this country and other kindred problems, to put at the disposal of the President, the Committee on Ways and Means of the House of Representatives, and the Committee on Finance of the Senate, whenever requested, all information, at its command, and to make such investigations and reports as might be requested by the President or by either of the committees or by either branch of Congress. In aid of these purposes and duties, it was empowered to subpoena witnesses and conduct hearings. The result of an investigation might be a recommendation to Congress that would lead to the increase or decrease of existing duties. There is nothing to show that in conducting these investigations it permitted any interested person to inspect its collected data, or to cross-examine others. On the other hand, it does affirmatively appear, set forth at large in its reports to Congress, that it withheld even from that body disclosure of the costs of production of individual producers, confining its reports to averages and symbols that gave no token of identity. Census of Dyes and Coal Tar Chem-

icals for 1917, p. 11; Ninth Annual Report, U. S. Tariff Commission, p. 17; Sixteenth Annual Report, p. 19.[2] From the beginning there has been an administrative policy to treat the costs or investments of identified producers as akin to a trade secret, with the result that disclosure, even if not strictly within the prohibition of the statute (Revenue Act of 1916, § 708), was forbidden in the view of the Commission by persuasive considerations of fair dealing and expediency. Congress did not then protest and indeed never has protested, though Congress was the very body for whose benefit the investigation had been made and the reports transmitted. In providing, as it did, in 1922, that a reasonable opportunity for a hearing should be given to any one affected by a change, it had no thought, we may well believe, to prohibit reservations and confidences that would be allowed against itself.

The administrative practice before the Act of 1922 might be too desultory and brief to fix the meaning of the statute if it did not find support, and that unmistakable and ample, in administrative practice afterwards. Consistently through all its hearings the Commission has acted upon the principle that the cost of production will not be made known to competitors if the producers are so few that there can be no disclosure of the cost without disclosing the identity of those producing at that cost. A report by the Commission, submitted by the Government in connection with the briefs, explains the practice that has been followed and the reasons supporting it. At times the reports by the Commission have shown costs identified by number or by letter. This has been done

---

[2] In the investigations by the Tariff Board of 1909, the practice apparently was the same. H. C. Emery, The Tariff Board and Its Work, p. 14, Government Printing Office, 1910.

in those instances and those only where producers were
so many that identity was cloaked. Even then, it was
often necessary to combine the costs in one country, for
example, in Eastern Venezuela, with those in other coun-
tries, or to combine items of one class, for example, ad-
vertising expenses, with items of another class, such as
administrative expenses. At times the Commission has
resorted to the expedient of showing costs in the form of
averages. It has applied the same methods impartially
to residents and to foreigners. In one of its reports the
foreign costs of Danish and Dutch producers were pub-
lished in combined form in order to avoid disclosure of
the costs in Denmark, the principal competing country.
Finally a third group of reports exists where the cost data
are not given at all, either directly or indirectly. This
has been the form where there were fewer than three com-
panies, or where the number was very small and one pre-
dominated in the industry. The reports taken collectively
show variations in degree as to the kind and fulness of the
information imparted to the public, the variations de-
pending in every instance upon the estimate by the Com-
mission of the effect of the disclosure.[3] What is more sig-
nificant than any variations in the reports is a strain of
uniformity that runs through all alike. Not in one of
them is there a disclosure of the individual data brought
together by the Commission through the work of its in-
vestigators. Not in one is there the suggestion that the
reasonable opportunity for a hearing conceded by the stat-
ute carries with it the opportunity to inspect "every
particle of evidence" collected by the Commission, and
to examine and cross-examine the men who have
collected it.

---

[3] The Government has exhibited to the court the original reports
as well as a summary of their contents.

Acquiescence by Congress in an administrative practice may be an inference from silence during a period of years. In this instance the inference is strengthened when it is recalled that during some of those years the Commission was under fire. In 1926, there was a resolution by the Senate for the appointment of a committee to investigate the workings of the flexible tariff. S. Res. 162, 69th Congress. The inquiry was to have " particular reference to the regulations and procedure of the Tariff Commission, the powers exercised and the functions performed by said Commission, and to the institution, investigation, hearing, and decision of cases " arising under § 315 of the Act of 1922. United States Senate Hearings, Investigation of Tariff Commission, 1926, 1927. In the investigation that followed, the procedure and methods of the Commission were thoroughly explored. One of its members, Mr. Glassie, in his statement to the Committee, explained that it was impossible for the hearing to be " so conducted as to permit of the open disclosure of the individual evidence of costs." United States Senate Hearings, *supra,* p. 529. Indeed, without such explanation, the reservation of these and kindred confidences was made abundantly apparent by records and reports. At the close of the inquiry, the Committee reported to the Senate. Senate Report No. 1325, 70th Congress, First Session, May 28, 1928. A majority of the Committee advised that the flexible provisions of the tariff act be repealed for the reason chiefly that the President was already overburdened with executive duties, and that the Commission be reorganized as a congressional agency. There was no criticism of the practice whereby the costs of individual producers were treated as confidential. A minority report advised that the Commission be continued and with it the provision for a flexible tariff. Such it seems was also the judgment of Congress as a whole, for despite the majority report of the

Committee, the Commission exists today. Tariff Act of
1930, c. 497; 46 Stat. 590, 696, §§ 330–336.[4]

The administrative practice developed before the Act
of 1922 has thus been continued and confirmed with the

---

[4] There is instruction in the experience of England and Australia.

The English Import Duties Act of 1932 imposed upon an "Import Duties Advisory Committee" as well as upon an existing Board of Trade duties of investigation and advice akin to the respondent's. 28 Chitty's Annual Statutes, pt. I, pp. 93, 94, 99, 100.

Confidential information is protected as follows (§ 10):

"(1) No information relating to any individual business, being information which has been obtained by the Committee or the Board of Trade by virtue of the provisions of this Act, shall, without the previous consent in writing of the owner for the time being of that business, be published or disclosed except to members of the Committee or to a Government Department requiring that information for the purposes of this Act, or to a person authorised by the Committee or by a Government Department and requiring that information for those purposes, or except for the purposes of a prosecution under this Act."

Australia also has a Tariff Board. At first, there was no requirement of public hearings. Tariff Board Act of 1921. The Board states in its report for the year 1923: "It will readily be understood when representatives of industries or manufacturers are called upon to give definite details of their costs and manufacture such information must be given confidentially." Third Annual Report of Australian Tariff Board, June, 1923, p. 23. A requirement of public hearings was imposed by an amendment of the statute. Tariff Board Act of 1924, § 3. It then became necessary that applicants for increases or decreases "present their cases publicly and on oath." Seventh Annual Report of Australian Tariff Board, June, 1928, p. 14. This does not mean, however, that there is no restraint upon publicity. The same statute provides that upon the objection of a witness, evidence which the Board is satisfied is of a confidential nature may be presented in private if the Board considers it desirable in the public interest to do so. Annals of the American Academy of Political and Social Science, vol. CXLI, January, 1929, Tariff Problems of the United States, pp. 83, 84. The Board evidently considers cost figures to be confidential. Third Annual Report, *supra*. They were so considered, it seems, in the debates in Parliament. 108 Parl. Debates, 3968, 4003 (1924).

tacit approval of the President and the acquiescence of the Congress. As late as January 28, 1933, after this cause had been submitted to the court, the signs of acquiescence and approval were strikingly renewed. On that day there was a resolution by the Senate directing a report by the Commission in respect of problems of the tariff. 76 Cong. Rec., pp. 2877, 2878. One of the subjects to be reported was the "range and variety of costs of production related to the quantities produced in each cost range in the United States and in competing foreign countries for each industry investigated by the Tariff Commission since 1920 (so far as can be given without disclosing the costs of individual concerns)." The history of the methods of this investigating body is thus carried down to date. True indeed it is that administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction. True it also is that administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. *United States* v. *Moore,* 95 U. S. 760, 763; *Logan* v. *Davis,* 233 U. S. 613, 627; *Brewster* v. *Gage,* 280 U. S. 327, 336; *Fawcus Machine Co.* v. *United States,* 282 U. S. 375; *Interstate Commerce Commn.* v. *N. Y., N. H. & H. R. Co.,* 287 U. S. 178. The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new. *Fawcus Machine Co.* v. *United States, supra.*

To the external aids that are drawn from history and analogy and administrative practice there is to be added another that may be said to be internal, the aid to be derived from the wording of related sections. In the same tariff act that makes provision in these general words for a hearing by the Commission as a step in the develop-

ment of the process of legislation, there is another section prescribing the remedy available to an importer after the legislative process has been completed, and the question is whether the merchandise has been properly appraised. Act of September 21, 1922, c. 356, § 501, 42 Stat. 966; 19 U. S. Code, § 381. The remedy in such circumstances is an appeal from the decision of the appraiser to the Board of General Appraisers. The Board shall assign the appeal to one of its members, who shall give reasonable notice of the time and place of the hearing, " at which the parties and their attorneys shall have an opportunity to introduce evidence and to hear and cross-examine the witnesses of the other party and to inspect all samples and all papers admitted or offered as evidence." This is the way that Congress spoke when it wished to attach to an administrative proceeding the incidents of a trial in court. There are times when the obscurity of one section as contrasted with the clearness of another may be ascribed to inattention. The need is not perceived of filling up the outlines because what is within them is assumed or carelessly overlooked. Not so in this case where Congress had its attention sharply directed to the fact that plain speech was needed if a hearing was to mean so much. Until it spoke thus plainly, the importer was denied the right to cross-examine and inspect, and this though the privilege of a hearing had been his for many years. It took an explicit statute to overcome the long established policy of the government whereby witnesses testifying to values were to be protected from publicity.[5] If the dis-

---

[5] " It is due to merchants and others called to give such information that their statements shall be taken in the presence of official persons only. It must often occur that persons in possession of facts which would be of value to the appraisers in determining market values are deterred from appearing or testifying by the publicity given to reappraisement proceedings." See the Treasury Instructions of June 9, 1885, set forth in full in *Auffmordt* v. *Hedden, infra.*

satisfied importer " is afforded such notice and hearing as enables him to give his views and make his contention in respect to the value of his goods, he cannot complain." *Origet* v. *Hedden*, 155 U. S. 228, 238; *Auffmordt* v. *Hedden*, 137 U. S. 310.[6] For years this opportunity for a statement was his only legal privilege, though the effect of the appraisal had a direct relation to his own interests and burdens as contrasted with the interests and burdens that concern the public generally,—though the controversy, in brief, was closer to the field of judicature than to that of legislation. *A fortiori* the privilege is no greater in such a controversy as this where legislation rather than judicature supplies the paramount analogy.

We are not unmindful of cases in which the word " hearing " as applied to administrative proceedings has been thought to have a broader meaning. All depends upon the context. There is no denial of the power of Congress to lay bare to the business rivals of a producer and indeed to the public generally every document in the office of this Commission and all the information collected by its agents. The question for us here is whether there was the will to go so far. The answer will not be found in definitions of a hearing lifted from their setting and then applied to new conditions. The answer will be found in a consideraton of the ends to be achieved in the particular conditions that were expected or foreseen. To know what they are, there must be recourse to all the aids available in the process of construction, to history and analogy and practice as well as to the dictionary. Much is made by the petitioner of the procedure of the Interstate Commerce Commission when regulating the conduct or the charges of interstate carriers, and that of the Public Service Commissions of the states when regulating the

---

[6] See Freund, Administrative Powers over Persons and Property, p. 162, and compare pp. 158, 160.

conduct or the charges of public service corporations. The Tariff Commission advises; these others ordain. There is indeed this common bond that all alike are instruments in a governmental process which according to the accepted classification is legislative, not judicial. *Prentis* v. *Atlantic Coast Line Co.,* 211 U. S. 210, 226; *Keller* v. *Potomac Electric Power Co.,* 261 U. S. 428, 440. Cf. *People ex rel. C. P. R. Co.* v. *Willcox,* 194 N. Y. 383, 386; 87 N. E. 517. Whatever the appropriate label, the kind of order that emerges from a hearing before a body with power to ordain is one that impinges upon legal rights in a very different way from the report of a commission which merely investigates and advises. The traditionary forms of hearing appropriate to the one body are unknown to the other. What issues from the Tariff Commission as a report and recommendation to the President, may be accepted, modified or rejected. If it happens to be accepted, it does not bear fruit in anything that trenches upon legal rights. No one has a legal right to the maintenance of an existing rate or duty. Neither the action of Congress in fixing a new tariff nor that of the President in exercising his delegated power is subject to impeachment if the prescribed forms of legislation have been regularly observed. It is very different, however, when orders are directed against public service corporations limiting their powers in the transaction of their business. They may be challenged in the courts if the effect is to reduce the charges to the point of confiscation. *Smyth* v. *Ames,* 169 U. S. 466. They may be challenged for other reasons when they are without evidence supporting them and are merely arbitrary edicts. *Interstate Commerce Comm'n* v. *Union Pac. R. Co.,* 222 U. S. 541, 547; *Manufacturers Ry. Co.* v. *United States,* 246 U. S. 457, 481; *Northern Pac. Ry. Co.* v. *Dep't Public Works,* 268 U. S. 39, 44; *Chicago, M. & St. P. Ry. Co.* v. *Public Utilities Comm'n,* 274 U. S. 344, 351. Cf. Sharfman, The

Interstate Commerce Commission, vol. II, p. 424. The "hearing" that such commissions are to give must be adapted to the consequences that are to follow, to the attack and the review to which their orders will be subject. *Interstate Commerce Comm'n* v. *Louisville & N. R. Co.,* 227 U. S. 88, 93; *St. Louis-S. W. Ry. Co.* v. *Interstate Commerce Comm'n,* 264 U. S. 64; *Atchison, T. & S. F. R. Co.* v. *United States,* 284 U. S. 248. The Commerce Act, as it stands today, and kindred statutes in the states, are instinct with the recognition of a duty to give a hearing of such a kind that the courts will understand why a Commission has acted as it has if their supervisory powers are afterwards invoked for enforcement or revision. No such inference is to be drawn from the act before us now.

The tokens of intention set down in this opinion have a force in combination that is denied to any one of them alone. They impel us to the holding that within the meaning of this act the "hearing" assured to one affected by a change of duty does not include a privilege to ransack the records of the Commission, and to subject its confidential agents to an examination as to all that they have learned. There was no thought to revolutionize the practice of investigating bodies generally and of this one in particular. Hearings had once been optional. By the new statute they became mandatory. The form remained the same.

2. Our second question must now be answered: If something less is due than inspection without limit, is there a minimum of disclosure without which the purpose of a hearing will be thwarted altogether, and was this minimum attained by what was done by the Commission here?

The argument for the petitioner portrays the American producer in the position of a plaintiff tendering an issue to others which they are called upon to meet like defendants in a lawsuit. The picture is misleading, for in truth

there is no lawsuit nor anything akin to it. See the testimony of Mr. Glassie in the investigation by the Senate (U. S. Senate Hearings, p. 516). The Commission, in conducting an investigation, is free to act on its own motion. Indeed it often does so. If it is moved by some one else, the investigation is still its own, the request amounting to a mere suggestion which it is free, in its discretion, to accept or to reject. There is nothing in its rules whereby applicants are placed under a duty to state the figures of their costs, still less to divide the total into items. On the contrary, the rules provide that " an application is not required to be in any special form." It " must state the name, legal residence, business address, occupation and business connection of the applicant, and contain a short and simple statement of the relief sought and the grounds therefor." If it is deemed to be insufficient, " the Commission may permit the applicant to amend the same or to submit evidence orally or in writing." A statement by an applicant that it has been compelled to close its plant because it has been unable to hold its own against foreign competition by reason of disparity of costs in this country and abroad will present a hardship to be investigated if the Commission believes that investigation will be helpful. Certainly there is nothing in any provision of the statute whereby the opponents of an increase may insist that something more than this be shown before they may be called upon to come forward and oppose.

The difficulty is not fully met, however, when we hold that a statement of the costs is not required at the beginning to set the process of investigation going. The question remains whether a statement in some form, even though fragmentary and stripped of detail, may be necessary later on. The persons affected by the change of duty are entitled to a hearing, and this involves, so it is said, such a modicum of information, such a disclosure of the costs in the form of percentages of the market price or

otherwise, as to give notice of the ultimate facts to be contested and overcome. What is required in that view is not a bill of particulars, nor a disclosure of the evidence, but a definition of the issue which is to be the theme of the debate.

The argument thus stated ignores the historic function of the Commission as the adviser of the President or Congress in the business of legislation, and views it as an arbiter between adverse parties litigant. This is to subject its action to the test of an unreal analogy. If the Commission is under a duty to make disclosure of the costs at all, the origin of the duty and its measure are to be found, we think, in this, that since a hearing is required, there is a command by implication to do whatever may be necessary to make the hearing fair. A duty so indeterminate must vary in form and shape with all the changing circumstances whereby fairness is conditioned. The appeal is to the sense of justice of administrative officers, clothed by the statute with discretionary powers. Their resolve is not subject to impeachment for unwisdom without more. It must be shown to be arbitrary.

Arbitrary in this instance it certainly was not, and that for several reasons.

(a) The Commission did not withhold disclosure from the petitioner with any sinister purpose to make the hearing ineffective. It was moved by the belief that a way could not be found of stating the costs without identifying them with the business of a particular producer. In so acting it conformed to its own precedents and practice, and to those of such commissions generally. If it was under a duty to give a hearing similar to one in court, it was bound to expose everything, details as well as summaries. There was then no middle ground. If it was under a duty to give the kind of hearing that was fair in all the circumstances, it was free to shape its course within reasonable limits by its own conception of the promptings

of policy and fairness. It would have kept within the statute even though it had made the hearings private and had refrained from the publication of anything, either the records of its agents or the testimony of witnesses. 62 Cong. Rec., pt. 11, p. 11,232. Instead, it made the hearings public, and exposed everything to view except only when publication was likely in its judgment to result in hardship or injustice. Ninth Annual Report, United States Tariff Commission, p. 13; see the Rules of the Commission quoted *infra* in this opinion. There is indeed a possibility that the work of such a body would be seriously hampered if producers were not made to feel that information which in the thought of many is ranked as confidential would be withheld from prying eyes.[7] Particularly might that be so when inquiry would have to be made of manufacturers abroad, not subject to compulsion.[8] Business men may exaggerate the importance of secrecy in matters of this kind. Their sensitiveness is to be reckoned with, whether it be reasonable or not.

(b) The attack upon the ruling of the Commission as a denial of a fair hearing in a primary and basic sense is weakened even more when consideration is directed to what the petitioner then asked for.

There was no appropriate motion or objection that brought to the notice of the Commission a claim that apart from any details there was a certain minimum of information due to the petitioner which the Commission was withholding. There is no reason to believe that this minimum was then an object of desire, or that it would have been helpful if conceded. The only statement by the petitioner approaching such a notice was a request that it be furnished with a complete, and not a deleted, copy of

---

[7] See the Reports of the Australian Tariff Board, *supra*.

[8] See the minority report of the Investigating Committee of the Senate under the 1926 resolutions, Senate Report No. 1325, *supra*, at p. 7. See also Senate Hearings, p. 1086.

the application for relief. The record makes it plain, however, that included in the application were supporting facts and figures giving the costs in fullest detail. The petitioner did not suggest at any time that it would be satisfied with less. On the contrary, its request for a copy of the application was accompanied or quickly followed by a motion setting forth in five subdivisions the particulars exacted, and culminating in a demand that " every particle of evidence " collected by the Commission be held subject to inspection. That was its attitude, made manifest in many ways to the members of the board. That was again its attitude on the petition to the court for a writ of mandamus to hold the Commission to its duty. There would be no justice at this late day in invalidating the proceedings for the failure to supply the petitioner with some average or aggregate which it did not state that it cared for, which even now is not explained, and which, in all likelihood, if given, would have added little to its knowledge.[9] Business men as a rule are not wholly in the dark as to the ways of their competitors.

(c) For still another reason the ruling made by the Commission was not an arbitrary refusal to give the kind of hearing that in the circumstances of this particular inquiry was reasonable and fair.

The unwillingness of the petitioner to submit the costs of its Norwegian principal, or to make any effort to submit them, has closed its mouth to the complaint that the refusal to disclose the costs of its American competitor has nullified the report and the proclamation based upon it.

The Norwegian principal, as we have seen, declined to give any information to the agents of the Commission and left them to make up their estimate of the foreign

---

[9] As to other methods available of ascertaining the cost of production with approximate accuracy, see the testimony before the Senate Investigating Committee, p. 1086.

costs from indirect and imperfect sources. The petitioner, to be sure, was an agent, not a principal, yet it was the exclusive agent in the United States, and plainly in a relation that gave it influence, if not authority. Not once during the hearing did it offer to make an effort to obtain the foreign costs and submit them to the Commission under a pledge of confidence or otherwise. Its attitude was one of indifference so complete as to vary hardly at all, or so at least the Commission might reasonably infer, from one of purposeful obstruction.

This attitude of obstruction is not to be ignored in determining whether the information to be imparted to the petitioner was curtailed by the Commission in any arbitrary way. One who seeks equity must do it.

The question in that aspect becomes this: Does justice require that the costs of a domestic producer shall be made known to an importer who is unwilling to use reasonable effort to make disclosure of the costs of his principal abroad? A mind neither perverse nor arbitrary in its judgments might think the answer should be " no."

There is left a final question. The petitioner makes the point that the Commission by its own rules has spread its records open to the inspection of interested parties, and that there was a violation of those rules by denying an inspection here. The argument may not prevail. A rule of the Commission does indeed provide as follows: " Parties who have entered appearances shall, prior to the filing of briefs, have opportunity to examine the report of the Commissioner or investigator in charge of the investigation and also the record except such portions as relate to trade secrets and processes." The evidence leaves no room for doubt that the exception stated in this rule has been construed by the Commission as keeping costs secret for the protection of producers, both foreign and domestic, unless disclosure is so cloaked that the identity of the producers will be effectively disguised.

Disguise has been found to be impossible when the producers are but two or three. The phrase " trade secrets and processes " is not a new one in the law. It occurs in statutes and judicial decisions as well as in the rule. The Commission was without competence by any decision it might make to fix the meaning of the phrase as used by Congress or the courts. It had power, however, to interpret its own rules and any phrase contained in them. *Evans* v. *Backer,* 101 N. Y. 289, 292; 4 N. E. 516; *Duncan's Heirs* v. *United States,* 7 Pet. 435, 451, 452. This it has done by an administrative practice too clear to be misread.

The judgment is *Affirmed.*

MR. JUSTICE MCREYNOLDS is of the opinion that the judgment should be reversed.