### BOYER v. MILLER HATCHERIES, Inc.
#### Civil Action No. 31.

District Court, S. D. Iowa, E. D.

Nov. 25, 1941.

James F. Hudson and Frank W. Oertel, both of Keokuk, Iowa, for plaintiff.

Ralph B. Smith, of Keokuk, Iowa, Chas. E. Rendlen, of Hannibal, Mo., and John E. Park, of Kansas City, Mo., for defendant.

DEWEY, District Judge.

This action is brought by the plaintiff to recover the difference between the wages paid to him and those provided by the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., during the period from October 24, 1938, to the first day of July, 1940.

The action came on for hearing in open court at Keokuk, Iowa, on the 20th day of November, 1941, upon the issues, evidence was introduced, oral and written arguments had and the case submitted.

#### The Facts.

There is little dispute in the testimony.

The defendant, Miller Hatcheries, Incorporated, was during the time in question engaged in the business of operating a commercial hatchery in Keokuk, Iowa.

The defendant used a building and equipment located in the City of Keokuk in the

operating of a chicken hatchery and owned no real estate or farming equipment.

In the defendant's hatchery were 19 large electric incubators wherein eggs are set and incubated and from which baby chicks are produced.

The eggs so used and set in said incubators came from farms in the general vicinity of defendant's hatchery and practically the entire product was sold to and for farmers and poultrymen. Keokuk is a town of about 16,000 population and is located in the extreme southeastern point of the State of Iowa and its trade territory includes the States of Iowa, Illinois and Missouri.

The total capacity of the incubators was the production of about 100,000 baby chicks a week and the capacity of the incubators was 300,000 eggs at one time.

The corporation produced and sold about 1,000,000 baby chicks a year. Ninety-five per cent. of the income of the corporation was from the sale of baby chicks which grossed about $90,000 a year. The baby chicks were sold over a large territory, the distribution being by parcel post and express.

The plaintiff, during the period in which he claims additional compensation, was not engaged in any particular part of the hatchery business, but as a general utility man—driving trucks to collect eggs and delivering chickens, cared for the incubators, both before and after they were used and during the time of hatching, culled chickens on farms, graded the eggs, worked around the hatchery and filled orders for baby chicks and shipped them.

Defendant, among other things, alleges: "That each and every service performed by the employees of defendant's hatchery, including plaintiff, are and were a part of or incidental to and constituted a part of the hatching of baby chicks as a whole * * * ."

Sometime prior to December, 1940, and before the commencement of this suit, the defendant by unanimous consent of its stockholders and after all the formalities required by statute for dissolution of a corporation had been taken, was dissolved as of December 31, 1940.

### Findings of Fact.

1. The defendant was engaged in interstate commerce during the period in question.

2. The plaintiff was also engaged in interstate commerce during the period in question.

3. During the period from October 24, 1938, to July 1, 1940, the plaintiff worked for the defendant longer hours and for a smaller wage than that provided by the Fair Labor Standards Act.

The difference between what he received and what he should have received, if paid according to the terms of the Act, aggregate $355.36.

Plaintiff does not ask for overtime which he testifies he worked, as he is unable to definitely prove the extent of such overtime as he does not have any records of such work; but the books of the company show that if he had been paid the minimum wages as provided by the Fair Labor Standards Act, during the period which he worked, he should have been paid the total additional amount stated above.

4. Defendant does not come within any exemptions of the Act.

Defendant practically admits the interstate character of its business and that the plaintiff during the period of his employment was engaged in such activities; but the defendant claims that it comes within certain exemptions in the provisions of the Fair Labor Standards Act, for the following reasons: that it is exempt from the provisions of the Act, (a) under the general agricultural exemption; (b) because of the seasonal nature of its business or the seasonal character of the work performed by the plaintiff; (c) because certain work performed by the plaintiff—the culling of flocks and local sales— is specifically exempt from the minimum wage and maximum hours provisions of the Act.

These claimed exemptions are in Sec. 213, Title 29, United States Code Annotated (Sec. 13, Fair Labor Standards Act of 1938). Several of the provisions of these exemptions are relied upon, but none of them are of any merit except that relating to "Agriculture." That section (213) provides, among other things, as follows: Sec. 213. Exemptions: "(a) The provisions of sections 206 and 207 [Secs. 6 and 7 of the Act] shall not apply with respect to * * * (6) any employee employed in agriculture; * * * (10) to any individual employed within the area of production (as defined by the Adminis-

trator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products." And under the list of definitions found in Section 203 of Title 29, United States Code Annotated (§ 3, Fair Labor Standards Act), is the following: Sec. 203. Definitions: "* * * (f) 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities, * * * the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

And Interpretative Bulletin No. 14, issued by the Wage and Hour Division of the Department of Labor, gives a further definition to the phrase, "raising of poultry," as follows: "The term 'raising of poultry' includes the breeding, feeding and general care of poultry. The word 'poultry' includes domesticated fowl and game birds."

Defendant strenuously insists that it comes within the exemption as being within the definition of "Agriculture" and within that part of the above definition which provides an exemption for the "raising of poultry."

It will be admitted, of course, that if the plaintiff was employed in the raising of poultry that he comes within the express provisions of the exemptions to the statute. However, I cannot convince myself that the operation of these large commercial hatcheries are enterprises engaged in raising poultry within the ordinary and common meaning of the term. To say that the commercial processing or incubating of a chicken from the egg is raising poultry gives a forced and unnatural meaning to the words employed.

No definition of agriculture in the cases cited is broad enough to include a commercial hatchery as being "agriculture,"

nor is it within the definition of agriculture contained in the Act or Interpretative Bulletin No. 14.

The Fair Labor Standards Act being a remedial statute the exemption provisions therein must be strictly construed. Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52.

I think the court can take judicial notice of the growth of these commercial hatcheries. The farmers of Iowa after the introduction of incubators for farm purposes used them quite generally but their operation was never a complete success. The institution of the commercial hatcheries, although started in a small way, met with almost instantaneous success and such hatcheries grew in importance and size and amount of business done. The farmers found that by purchasing young chicks from these hatcheries they could stock their farms with the grade or breed of chickens they desired in large quantities and could make a profit from the venture. By scientific methods of selectivity the baby chicks were healthier and freer from disease than those generally raised on the farms. The hatchery business has become a recognized commercial enterprise. These hatcheries do not in general operate farms but are a purely urban business, although they do exercise some control by culling the flocks and taking blood tests of the chickens on the farms from which they purchase their eggs. Such was the defendant hatchery at Keokuk, Iowa.

The defendant, however, produces some persuasive authorities for its position. Judge Reeves of Kansas City, Mo., in 1938, in a bankruptcy proceeding entitled "In the Matter of Irving Lee Bush and Margaret E. Bush,"[1] was of the opinion that these commercial hatcheries were engaged in raising poultry. He cites an opinion of the general counsel for the Administrator of the Fair Labor Standards Act to the same effect.

However compelling are the opinions of these authorities cited by the defendant, I am unable to say that a commercial hatchery engaged in buying eggs, incubating them and selling the baby chicks to farmers is the raising of poultry.

And against these authorities is the opinion and decision in the case of Bowie v. Gonzalez, supra, where very persuasive

---

[1] No opinion for publication.

138

arguments are found for the plaintiff's position.

5. The action can be maintained against the corporation even though the corporation was dissolved before the commencement of the suit.

This has been unquestionably determined by the courts of the State of Iowa. Wisconsin & Arkansas Lumber Co. v. Cable, 159 Iowa 81, 140 N.W. 211; Rogers v. Western Mut. Life Ass'n, 123 Iowa 722, 99 N.W. 589; State v. Fogarty, 105 Iowa 32, 74 N.W. 754; Muscatine Western R. Co. v. Horton, 38 Iowa 33; Muscatine Turn Verein v. Funck, 18 Iowa 469.

The question of whether the notice was served upon the corporation is without merit as the defendant, at least in the amendment to its answer, has appeared in the action.

### Conclusions of Law.

1st. I find that plaintiff has established his cause of action . as against the defendant and that the defendant has not paid him for his services rendered within the period from October 24, 1938, to July 1, 1940, the amount required by the Fair Labor Standards Act, in an amount of $355.36, and that plaintiff is entitled to recover a penalty as provided by the statute in a similar amount of $355.36, together with an attorney fee.

2nd. I find in favor of the plaintiff and that he is entitled to recover as against the defendant in the sum of $710.72, together with attorney fees fixed at $150, and the costs, and the Clerk is directed to enter judgment in favor of the plaintiff and against the defendant for said sum of $710.72, and the costs of the action, to include an attorney fee of $150. The defendant Miller Hatcheries, Inc., excepts.