**MILLER HATCHERIES, Inc., v. BOYER.**

**No. 12263.**

Circuit Court of Appeals, Eighth Circuit.

Nov. 3, 1942.

284

John B. Gage, of Kansas City, Mo. (John E. Park and Gage, Hillix, Hodges & Cowherd, all of Kansas City, Mo., on the brief), for appellant.

James F. Hudson and Mr. Frank W. Oertel, both of Keokuk, Iowa, for appellee.

Warner W. Gardner, Sol., and Mortimer B. Wolf, Asst. Sol., both of Washington, D. C., Kenneth P. Montgomery, Regional Atty., of Kansas City, Mo., and Peter Seitz, Atty., United States Department of Labor, of Washington, D. C., for Administrator of the Wage and Hour Division, amicus curiae.

Before SANBORN, THOMAS, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The crucial question is whether a commercial chicken hatchery, located in a city and selling its baby chicks to farmers and poultry-raisers, is exempt from the wage and hour provisions of the Fair Labor Standards Act of 1938,[1] on the ground that its employees are "employed in agriculture", within the meaning of section 13(a) of the Act.[2]

The Administrator of the Wage and Hour Division, during the four years that the Act has been in effect, has consistently made the interpretation that the operations of such a hatchery constitute "the raising of * * * poultry" within the definition of "agriculture" contained in section 3(f) of the Act,[3] and that employees engaged in the necessary incidents of these operations are therefore "employed in agriculture".[4]

The action here was one brought by an employee of such a hatchery, under section 16(b) of the Act, 29 U.S.C.A. § 216(b), to recover from his employer the difference between the wages paid him and those prescribed by section 6 of the Act, 29 U.S.C.A. § 206, together with an equal amount as liquidated damages and a reasonable attorney's fee. The hatchery involved was located in the city of Keokuk, Iowa, and was engaged in hatching, selling and distributing in commerce approximately 1,-000,000 baby chicks a year to farmers and poultry-raisers in Iowa, Illinois and Missouri. It was the employee's contention that the conduct of these commercial activities by an urban hatchery did not constitute "the raising of * * * poultry" within the intendment of the Act, and that he could not therefore properly be classified as

[1] Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201, et seq.

[2] § 13(a) of the Act, 29 U.S.C.A. § 213 (a) provides: "The provisions of sections 6 and 7 [206 and 207 of this title] [prescribing minimum wage rates and maximum hours for employees engaged in commerce or in the production of goods for commerce] shall not apply with respect to * * * (6) any employee employed in agriculture; * * *."

[3] § 3(f) of the Act, 29 U.S.C.A. § 203 (f) provides: " 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 15(g) [12 U.S.C.A. § 1141j (g) ] of the Agricultural Marketing Act, as amended), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

[4] Cf. United States Department of Labor, Wage and Hour Division, Interpretative Bulletin No. 14, issued June 1940, § 9 of which reads: "The term 'raising of poultry' includes the breeding, feeding, and general care of poultry." In the brief filed here as amicus curiæ, the Administrator further states that, during the period the Act has been in effect, he and his counsel have sent out hundreds of letters, in response to inquiries, expressing the opinion that the hatching of eggs falls within the scope of the exemption of § 13(a) (6) of the Act. A magazine article in the Hatchery Tribune for November, 1941, by the Chief of the Magazine Service Section of the Information Branch of the Wage and Hour Division, likewise states: "Hatcherymen, however, are agriculturists, and their hatchery employees may be worked without regard to these minimum wage and maximum hour provisions or any other provisions of the law."

"employed in agriculture", so as to exclude him from the benefits of the wage and hour provisions of the statute.

The District Court rejected the interpretation which had been made by the Administrator and, in sustaining the contention of the employee, declared: "I cannot convince myself that the operation of these large commercial hatcheries are enterprises engaged in raising poultry within the ordinary and common meaning of the term. To say that the commercial processing or incubating of a chicken from the egg is raising poultry gives a forced and unnatural meaning to the words employed."[5]

In the brief filed here by the Administrator as amicus curiae, he has attempted to set out, frankly and succinctly, both the considerations which appear to him to support his previous interpretation and those which support the position of the District Court. Briefly, the general considerations upon which the Administrator's interpretation is declared to rest are that the legislative history of the Act indicates that the term "agriculture" was used in a broad and general sense and its definition was intended to be "all-inclusive";[6] that "the raising of poultry" necessarily includes the "breeding" of it, and "hatching" is merely part of the process of "breeding";[7] that hatching chicks is an integral part of agriculture, in that it is a necessary link between the production of the two important agricultural commodities, poultry and eggs; that hatching is admittedly agricultural when performed on a farm, and that the incidents of such work, when done in a commercial hatchery for the purpose of supplying farmers with baby chicks, under the now common practice of utilizing this more efficient instrumentality as a step in the agricultural processes, are so closely and directly related to the modern conduct of farming that they ought not to be regarded as having changed the fundamental aspect of the work involved, but as having merely altered the surroundings in which the work is being performed.

As supporting the position of the District Court, the Administrator points out that it may reasonably be contended that the hatching of baby chicks by a commercial hatchery is an industrialized and highly specialized activity which does not itself have any direct connection with "farming operations"; that the economic function of such an urban establishment is completely disassociated from the agricultural activities of producing and hatching eggs and feeding, tending and otherwise "raising" poultry for market; that when the hatching of chicks is thus transposed from the farm to a commercial establishment it ceases to be a technical farming activity and is outside the purpose and intention of Congress in excepting agricultural employment; that the attributes of farm labor which justify its exclusion from the coverage of the Act ought not to be regarded as extending to services performed for such a commercial hatchery; and that the careful enumeration of the operations included within the agricultural exception, viewed in the light of the intention evidenced by the last clause of section 3(f), 29 U.S.C.A. § 203(f), points to the conclusion that, while a broad conception of "agriculture" was intended in relation to "farming operations", a more narrow construction was intended with respect to "the raising of livestock, bees, fur-bearing animals, or poultry."

█ We have previously declared that an exemption to remedial legislation, such as the Fair Labor Standards Act of 1938, "creates an exception to the general scope of the Act, and hence is subject to strict

---

[5] Boyer v. Miller Hatcheries, Inc., D.C. S.D.Iowa, 42 F.Supp. 135, 137.

[6] Cong.Rec. Vol. 83, p. 9162.

"Mr. Johnson of California: Will the Senator state generally what agricultural products are exempted?

"Mr. Thomas of Utah: It seems to me that if the Senator will read subsection (c) he will find included practically everything which is agricultural, so far as hours are concerned * * *.

"Mr. Johnson of California: I take it from what the Senator has said that the agricultural exemptions are practically plenary, and take in almost all agricultural products * * *, that in general language, agriculture is exempted from the operation of the bill.

"Mr. Thomas of Utah: It is.

"Mr. Johnson of California: Does the Senator know of any particular kind of agriculture that is included in the bill?

"Mr. Thomas of Utah: I do not know of any. The definition seems to be all-inclusive, and we tried to make it so."

[7] Raise: "To cause or procure to be produced, bred or propagated; * * *." Breed: "To produce (offspring) by hatching or gestation; * * * to hatch." Webster's New International Dictionary, Second Edition.

construction."[8] Such an exemption should be extended only to those who are "plainly within its terms".[9]

■ But, in the circumstances of the present situation, there is another principle that also soundly must be taken into account. We are dealing with a situation where there has been "a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."[10] The practical interpretations which the Administrator and his staff have been required to make in applying and placing the provisions of the Act in social and industrial operation should be recognized as having peculiar persuasiveness [11] and weight.[12] Unless such a construction is one which could not reasonably or soundly be made under the terms of the statute, it should ordinarily be accepted by the courts. Especially is this true where its rejection will result in an economic dislocation in the industry involved, by virtue of its previous reliance upon the Administrator's interpretation, as well as a general inequity against the class to which it is to be applied, under the circumstances in which the changed construction is being made.

So far as the present situation is concerned, it appears that at the time the Fair Labor Standards Act went into effect the commercial hatcheries sought to have their status defined by the Administrator. The Administrator and his legal staff immediately [13] took the position that the operations of hatcheries engaged in selling baby chicks to farmers were within the agricultural exemptions of the Act. This interpretation has been consistently adhered to and specifically repeated in hundreds of letters since sent out by the Administrator in response to inquiries from hatcheries throughout the country. The industry has manifestly proceeded in reliance upon its exemption from the Act, in its relations with employees and in its sales to farmer-customers, during the four-year period that the Act has been in effect. The employees of the industry have apparently also generally accepted the Administrator's interpretation, since the present action appears to be the only judicial challenge that has been made to the Administrator's construction during the several years that have now elapsed.[14]

---

[8] Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 56. See also Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16.

[9] Gregg Cartage & Storage Co. v. United States, 316 U.S. 74, 83, 62 S.Ct. 932, 936, 86 L.Ed. 1283.

[10] Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796.

[11] "This has been the Administrator's interpretation of the Act. Interpretative Bulletin No. 4 issued October 21, 1938, revised November, 1940. While the interpretative bulletins are not issued as regulations under statutory authority, they do carry persuasiveness as an expression of the view of those experienced in the administration of the Act and acting with the advice of a staff specializing in its interpretation and application." Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 580, note 17, 62 S.Ct. 1216, 1217, 1221, note 17, 86 L.Ed. 1682.

[12] "The Commission and the Wage and Hour Division, as we have said, have both interpreted Section 204(a) as relating solely to safety of operation. In any case such interpretations are entitled to great weight. This is peculiarly true here where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" United States v. American Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345.

[13] In a letter dated November 2, 1938, ten days after the Act became operative, Calvert Magruder, then General Counsel for the Wage and Hour Division, advised the operator of a commercial hatchery that "such operations constitute the raising of poultry and are therefore within the statutory definition of 'agriculture.'"

[14] The only other proceeding of which we are aware in which the question involved has arisen is In re Bush, No. 14989, in the District Court of the United States for the Western District of Missouri, where, in 1938, in a proceeding under section 74 of the Bankruptcy Act, 11 U.S.C.A. § 203, the receiver of such a commercial hatchery applied to the court for instructions as to what compliance he was required to make with the Fair Labor Standards Act in his operations. District Judge Albert L. Reeves there held, in an interpretative order, that the operations of such a commercial hatchery were exempt from the provisions of sections 6 and 7 of the Act, 29 U.S.C.A. §§ 206, 207.

If the interpretation of the Administrator is to be rejected at this late date, it necessarily will occasion a serious economic dislocation in the hatching industry, by reason of the accumulated liability against the hundreds of commercial hatcheries in the country for unpaid compensation and "double damages" dating back to October 24, 1938.

Without attempting to resolve the construction of the statute as a matter of original impression, it is sufficient to say that, from a careful consideration of the statute and the existing situation, we have no omniscient conviction that the Administrator's contemporaneous interpretation here has been so unreasonable and unsound that it could not fairly have been made, within the spirit and language of the Act. Congress may well have intended that hatchery operations, in their now common relationship to poultry raising by farmers, should be treated as so intimately and directly connected with farming activities as to constitute one of the exempt processes of agriculture. If it did not, the way is open to it to change the situation by a more specific legislative definition. In the absence of any such action, we feel that the Administrator's initial and four-year-continued, liberal interpretation of the all-inclusive scope of the agricultural exemption should not be disturbed.

The judgment of the District Court will accordingly be reversed and the cause remanded with directions to dismiss plaintiff's complaint.