**ILLINOIS CENT. R. CO. et al. v. UNITED STATES et al.**

No. 1012.

District Court, D. Delaware.
June 14, 1933.

R. S. Outlaw and Elmer A. Smith, both of Chicago, Ill., H. H. Larimore, of St. Louis, Mo., and E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., for plaintiffs.

Harry L. Underwood, of Washington, D. C., for Interstate Commerce Commission.

Elmer B. Collins, Sp. Asst. to Atty. Gen., and Leonard E. Wales, U. S. Atty., of Wilmington, Del., for the United States.

A. K. Shipe and John J. Esch (of Esch, Kerr, Woolley, Taylor & Shipe), both of Washington, D. C., for American Barge Line Company and others, interveners.

Clark C. Wren, of Washington, D. C., for Inland Waterways Corporation, intervener.

Harry H. Peterson, Atty. Gen. of Minnesota, for Upper Mississippi & St. Croix River Improvement Commission of Minnesota and others.

George C. Lambert, of St. Paul, Minn., A. C. Wiprud, of Minneapolis, Minn., Mortimer H. Boutelle, Sp. Asst. Atty. Gen. of Minnesota, for city of Minneapolis, Minn., and others.

Before THOMPSON, Circuit Judge, and DICKINSON and NIELDS, District Judges.

### Findings of Fact.

THOMPSON, Circuit Judge.

1. Plaintiffs herein are common carriers by railroad subject to the Interstate Commerce Act [49 USCA § 1 et seq.], and engage in the transportation of cotton from points of origin in the state of Arkansas and from Memphis, Tenn., to destinations in the states of Pennsylvania, New York, New Jersey, Massachusetts, Rhode Island, and Connecticut.

2. On August 29, 1932, plaintiffs and other railroad carriers, because of severe competition from unregulated truck and water carriers, established carload rates upon cotton from points of origin in the state of Arkansas and from Memphis, Tenn., to destinations in the states of Pennsylvania, New York, New Jersey, Massachusetts, Rhode Island, and Connecticut, upon a basis substantially and materially lower than the any-quantity rates theretofore prevailing, and on November 16, 1932, plaintiffs and other railroad carriers further reduced said carload rates in the belief that such further reduction was necessary to meet the competition above referred to.

3. By petitions dated October 31, 1932, and November 5, 1932, the American Barge Line Company applied to the commission to enter an order requiring the railroads participating in the said carload cotton rates to participate with it in joint through rail-barge-rail and barge-rail carload rates from the same origins to the same destinations upon a basis lower than the all-rail carload rates. The natural and normal effect of such participation in through routes and rates with the American Barge Line Company would be to divert cotton, in carloads, from the all-rail routes previously established to the lower rail-barge-rail and barge-rail routes.

4. By petitions dated November 12, 1932, and November 14, 1932, the carriers operating both east and west of the Mississippi river, including plaintiffs in this action, prayed the commission to set down for hearing the said applications of the American Barge Line Company, and represented to the commission in their said petitions that without a full and

fair hearing, after reasonable notice, at which hearing carriers by railroad, including plaintiffs, shippers, and other parties in interest, and representatives of the American Barge Line Company, should be permitted to appear and offer testimony and examine and cross-examine witnesses offered by all parties in any respect interested therein, the commission could not properly and justly determine the issues presented by such applications. The carriers by railroad further averred specifically that without such hearing the commission would be without proper evidence to determine:

(a) Whether carriers by railroad, including certain of these plaintiffs, should be required to join with the American Barge Line Company in establishing through rail-barge-rail rates and through barge-rail rates on cotton, in carloads, from Arkansas and Memphis, Tenn., to the destination territory heretofore described;

(b) Whether such through rail-barge-rail rates and barge-rail rates, or either of them, should be lower or the same as the through all-rail rates then in effect;

(c) What through routes, if any, should be required;

(d) What rail-barge-rail routes and barge-rail routes, if any, should be established; and

(e) What differential, if any, should be maintained for the water-rail routes under the all-rail routes.

5. In neither the petitions of the American Barge Line Company, dated October 31, 1932, and November 5, 1932, nor in the petitions or replies of the carriers dated November 12, 1932, and November 14, 1932, are there set forth any facts or evidence necessary to a determination by the commission of the issues presented by the applications of the American Barge Line Company. The petitions of the American Barge Line Company substantially set forth solely the ultimate conclusion that the establishment of rail and water rates there requested was desirable and in the public interest, and the petitions or replies of the carriers set forth in substance only a denial of such ultimate conclusion and a prayer for a hearing.

6. The Interstate Commerce Commission declined to grant to the railroad carriers a hearing as prayed in their petitions of November 12, 1932, and November 14, 1932, and without such hearing, on December 10, 1932, entered its said second supplemental report and order in Ex parte 102, Application of American Barge Line Company, in which plaintiffs and certain other carriers by railroad named therein were required to join with the American Barge Line Company in establishing, on or before January 25, 1933, upon fifteen days' notice, joint rail-barge-rail rates on cotton, in carloads, from the origin territory to the destination territory above described, upon a basis 8, 6, and 4 cents lower than the all-rail rates between the same points, dependent upon the application of varying minimum weights.

7. The said second supplemental order of the commission was made without evidence to support it, and there is no record before the commission which may be examined by a court if called upon to determine the legality or validity of the commission's order.

8. By petitions dated December 30, 1932, and January 7, 1933, the southwestern carriers by railroad, plaintiffs herein, on their own behalf and on behalf of other carriers by railroad similarly situated, requested the commission to vacate and set aside the said second supplemental order of December 10, 1932; to grant a reconsideration of all matters by the entire commission; in connection with such reconsideration to afford said railroads a hearing prior to the effective date of any order; and to extend the effective date of said second supplemental order of December 10, 1932, in order to afford the commission an opportunity to pass upon said petitions. The said petitions above referred to were denied by the commission in its order of January 18, 1933.

9. By appropriate orders of the commission the said second supplemental order of the commission of December 10, 1932, has been extended to become effective June 1, 1933, upon ten days' notice to the public.

10. The said second supplemental order of the commission will require the railroads serving the origin and destination territories involved to participate in joint through rail-barge-rail and barge-rail rates from points of origin in Arkansas and Memphis, Tenn., to destinations in the states of Pennsylvania, New York, New Jersey, Massachusetts, Rhode Island, and Connecticut, upon a basis 4, 6, and 8 cents lower than the corresponding all-rail rates between the same points, and to observe such rail-barge-rail and barge-rail rate so construed as a maximum rate as long as plaintiffs maintain all-rail carload rates on cotton between the same points of origin and destination heretofore referred to.

11. The said second supplemental order of the commission of date December 10, 1932, if made effective, will require carriers by rail-

road whose lines serve the state of Arkansas to participate in joint rail-barge-rail rates on cotton, in carloads, from Arkansas to the destination territory heretofore described, substantially lower than contemporaneously in effect via the all-rail routes in which such carriers now participate. In addition, such order will require carriers by railroad whose lines extend from Arkansas points to the St. Louis gateway to deliver cotton to the barge line at Memphis, Tenn., for transportation by water to Pittsburgh, Pa., in many instances short-hauling such carriers and depriving them of the full use of their lines of railroad.

12. Such carriers would, in the event the cotton is delivered to the barge line at Memphis, Tenn., receive less revenue than if such cotton were transported over all-rail routes to the St. Louis gateway and there delivered to eastern rail connections.

13. Carriers by railroad, plaintiffs in this action, who operate lines of railroad extending from the St. Louis gateway to the destination territory heretofore described, would, as to cotton moving rail-barge-rail, if the order of the commission referred to becomes effective, take such cotton at Pittsburgh, Pa., instead of at St. Louis, and would thereby be deprived of the use of their lines of railroad extending from the St. Louis gateway to Pittsburgh, Pa., and would receive less revenue than such carriers would receive if they enjoyed an all-rail haul from the St. Louis gateway to the destination territory involved under the all-rail rates now in effect.

14. Carriers by railroad serving Memphis, Tenn., with lines of railroad located west of Pittsburgh, as to cotton moving barge-rail, would be deprived of participation in the transportation of cotton, in carloads, moving from points in Arkansas and from Memphis, Tenn., to the destination territory before set out. Lines of railroad operated by carriers extending eastward from Pittsburgh, Pa., to the destination territory involved, would be required to participate in rail-barge-rail rates from points in Arkansas, and barge-rail rates from Memphis, Tenn., lower than now in effect via all-rail routes in which such carriers participate.

15. If the said second supplemental order of the commission becomes effective, plaintiffs will be unable to recoup in any manner any losses which they will sustain thereby and the damage done them will therefore be irreparable.

Conclusions of Law.

1. The statute here involved, section 3 (e) of the Inland Waterways Corporation Act, as amended, U. S. Code, tit. 49, c. 5, § 153 (e), 49 USCA § 153 (e), properly construed, requires the establishment by the Interstate Commerce Commission of through routes, joint rates, and differentials without a hearing in advance, and the order of the commission here attacked was made in pursuance of the express terms of the statute and not in disregard thereof.

2. Section 3 (e) of the Inland Waterways Corporation Act, as amended, vests in the Interstate Commerce Commission the power to require carriers by rail to participate in rail and water routes without opportunity to be heard before the entry of such an order or the effective date thereof to determine:

(a) Whether carriers by railroad, including certain of these plaintiffs, should be required to join with the American Barge Line Company in establishing through rail-barge-rail rates and through barge-rail rates on cotton, in carloads, from Arkansas and Memphis, Tenn., to the destination territory heretofore described;

(b) Whether such through rail-barge-rail rates and barge-rail rates, or either of them, should be lower or the same as the through all-rail rates then in effect;

(c) What through routes, if any, should be required;

(d) What rail-barge-rail routes and barge-rail routes, if any, should be established; and

(e) What differential, if any, should be maintained for the water-rail routes under the all-rail routes.

3. The second supplemental order of the commission is void because made without evidence to support it.

4. The second supplemental order of the commission is an affirmative and final order of the Interstate Commerce Commission which plaintiffs must comply with by a certain date or incur the penalties provided for by statute, and is such an order as may be reviewed by the courts pursuant to section 41, paragraph 28, and sections 43, 44, 45, 46, and 47, of title 28, United States Code Annotated.

5. Section 3 (e) of the Inland Waterways Corporation Act, as amended, authorizes the entry of an order and compliance therewith without hearing, denies the parties the right

to the judicial review of such order referred to in paragraph 4 hereof, and is arbitrary and unreasonable and therefore in violation of the Fifth Amendment to the Constitution of the United States.

6. Section 3 (e) authorizes the commission to establish joint rail and water rates without hearing or evidence, and constitutes a delegation of pure legislative power contrary to the provisions of article 1, § 1, of the Constitution.

7. The constitutional right of plaintiffs to a full and fair hearing before the entry of an order against them and compliance therewith is not complied with by provision for any subsequent hearing.

8. The constitutional right of plaintiffs to a full and fair hearing before the entry of an order against them and compliance therewith is not affected by the fact that the commission in some subsequent proceeding may change or alter its former order after hearing. If plaintiffs be required to comply with any such order for any period whatsoever without prior hearing their constitutional rights are invaded, and due process of law is denied them.

9. The action of the commission in denying plaintiffs' petitions for a hearing, and in requiring the joint rail and water rates to become effective without such hearing, denied to the carriers a hearing or opportunity to be heard and constituted a denial of due process of law, in violation of the Fifth Amendment to the Constitution of the United States.

· Opinion.

This suit was brought under the provisions of the District Court Jurisdiction Act, 38 Stat. 219 (28 USCA § 41, subd. 28) to set aside an order of the Interstate Commerce Commission and, pending final decree, to secure a preliminary injunction. The plaintiffs are common carriers by rail. The American Barge Line Company is a common carrier by water, and operates barges on the Ohio and Mississippi rivers between Pittsburgh and New Orleans. The barge company had on several occasions sought and obtained from the commission, in accordance with the provisions of the amended Inland Waterways Corporation Act, § 3 (49 USCA § 153 (e), certificates of public convenience and necessity which authorized it to operate on the named rivers. The commission ordered the plaintiff railroad carriers to establish through barge-rail rates and they complied with those orders. At the time of the entry of the orders, the railroads were operating under normal rates. Subsequently the plaintiffs and other carriers by railroad established so-called carload rates upon cotton from points in Arkansas and Memphis, Tenn., to points in the states of Pennsylvania, New York, New Jersey, Massachusetts, Rhode Island, and Connecticut. Those rates were lower than the any-quantity rates on cotton then prevailing and were designed to assist the railroads to meet competition from unregulated truck and water carriers. Following the establishment of these depressed rates, the barge company petitioned the commission to order the railroad carriers to establish through rail-barge-rail rates on cotton in carload lots for the territory already described. The railroad carriers petitioned the commission for a hearing on the application of the barge company. This hearing was denied.

The commission entered its second supplemental report and order in which it directed the plaintiffs to participate with the barge company in joint through rail-barge-rail and barge-rail rates on cotton in carloads, in the named territory, upon a basis of 8, 6, and 4 cents lower than the all-rail rates between the same points. The plaintiffs' petitions requesting the commission to vacate and set aside this second supplemental order and to grant them a hearing were denied. The effective date of the order has been extended to June 1, 1933. All parties have agreed by stipulation filed that the court may enter a final decree on the pleadings and record now before it.

The question in controversy is whether the commission was in error in refusing a hearing upon the plaintiffs' petition prior to entering the second supplemental order. The plaintiffs argue that the commission misconstrued the wording and the intent of the amended Inland Waterways Corporation Act, supra. They further contend that, if the commission was justified in its interpretation of the act, the act is unconstitutional in that it deprives the plaintiffs of property without due process of law in contravention of the Fifth Amendment to the Constitution, and constitutes a delegation of legislative power in violation of the provisions of article 1, § 1, of the Constitution.

Section 3 (e) of the act, 49 USCA § 153 (e), is as follows: "Any person, firm, or corporation, including the Inland Waterways Corporation, engaged or about to engage in conducting a common-carrier service upon the Warrior River or the Mississippi River, or any tributaries thereof, may apply to the Interstate Commerce Commission and obtain a

certificate of public convenience and necessity in accordance with the provisions of section 1 of this title, and the Interstate Commerce Commission shall thereupon, by order, direct all connecting common carriers and their connections to join with such water carrier in through routes and joint rates with reasonable rules, regulations, and practices, as provided in paragraph (3) of section 15 of this title, and the commission shall, in such order, fix reasonable minimum differentials between all rail rates and joint rates in connection with said water service to apply until changed by order of the commission. Such joint routes, rates, rules, regulations, and practices may be changed by order of the commission or by agreement of the water carriers and the other participating carriers. The commission shall further require the interested common carriers to enter into negotiations for the purpose of establishing equitable divisions of the aforesaid joint differential rates within thirty days after such joint rates are established, and if the carriers are unable to agree upon equitable divisions within one hundred and twenty days from date of publication the commission shall, by order, determine and establish reasonable divisions to become effective coincident with the effective date of the joint rates. The commission is hereby given authority upon complaint, at once, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning (1) the reasonableness or lawfulness of any through route or joint rate filed pursuant to such order of the commission, or (2) the reasonableness of any minimum differentials between all rail rates and joint rates in connection with any water service; or (3) the reasonableness of any division of joint rates ordered by the commission under the provisions of this section; and after full hearings the commission may make such order with reference to any such matters as it may find to be proper and in the public interest. At any such hearing the burden of proof concerning the unreasonableness or unlawfulness of any through route, joint rate, minimum differentials between all rail rate and joint rate in connection with water service, or division of joint rates shall be upon the carrier or carriers making the complaint; and the commission shall give the hearing and decision of such questions preference over all other questions pending before it, except such questions as are given like preference by law, and decide the same as speedily as possible. * * * "

The language of the act is unambiguous. There is no requirement that a hearing be had prior to the order establishing through routes and joint rates. The provision for a hearing appears later in that portion of the section wherein the commission is given authority to enter upon a hearing concerning the reasonableness or lawfulness of any through route or joint rate already filed in obedience to its order. Soon after the passage of the amendment to the Inland Waterways Corporation Act, the commission secured the views of interested parties with respect to the meaning and purpose of the section in dispute and with respect to the procedure which it should follow, particularly with reference to the extent to which public hearings are required. The commission concluded, at that time, that a hearing was not provided for nor required prior to the issuance of orders directing or prescribing through routes and joint rates. Its analysis of the provisions of the section is reported in Procedure under Barge Line Act, 148 I. C. C. 129.

A study of the situation which preceded the enactment of the Inland Waterways Corporation Act and of the amendment thereto discloses that Congress intended to foster transportation by water wherever possible. In House Report No. 1537, House of Rep., 71st Cong., 1st Sess., appears the following statement:

"This policy of opposition on the part of many of the railroads has resulted in years of delay in the extension of the benefits of water transportation to interior communities and has seriously retarded the successful operation of the Inland Waterways Corporation. Unless such opposition on the part of the railroad carriers is overcome and through routes, joint rates, and an equitable division of joint rates is made available without interminable delays and the heavy expenses necessary to carry on such proceedings before the Interstate Commerce Commission, privately owned transportation service will never be realized on the inland waterways of the country.

"The hearings on this bill convinced the committee that legislation somewhat drastic is now not only needed but is necessary in order to fully carry out the purposes for creating the Inland Waterways Corporation, and to realize the benefits of the policy of Congress manifested by the large expenditures made for the improvement of our inland waterways.

"Paragraph (e) of the bill was carefully

prepared to accomplish this purpose. If enacted into law, it is believed by the committee that it will immediately result in overcoming the reluctance of many of the railroads to cooperate with the Inland Waterways Corporation, and will aid in bringing about such through routes, joint rates, and fair division of joint rates as will afford to the people of a large part of the country the economies of cheaper transportation by water.

"This paragraph of the bill authorizes the commission to direct connecting common carriers to join with the water carriers in through routes annd joint rates, and to fix reasonable minimum differentials between all rail rates and joint rail and water rates; and it further authorizes the Commission to require the rail and water carrier to enter into negotiations for the purpose of establishing equitable divisions of joint rates within 30 days after such joint rates are established. If they fail to so agree upon equitable divisions within 120 days, the Commission shall itself determine and establish reasonable divisions of such rates. Provision is made for any carrier who feels aggrieved by such action of the Commission to make complaint and have a full hearing under short proceedings, and the Commission is authorized to give the hearing and decision of such question preference over all other questions pending before it, except such questions as are given like preference by law. All carriers are thus given their day in court."

Since it is our view that the commission did not misconstrue the act nor exceed the powers the Congress intended to confer upon it, the question is whether the act, so construed, is constitutional.

The second supplemental order, of which complaint is made, was unquestionably and admittedly made by the commission without according the plaintiffs an opportunity to submit evidence or examine and cross-examine witnesses. Many authorities may be cited holding that an order establishing rates, without hearing the public service corporations affected thereby, violates the guaranty of the Fifth Amendment of the Constitution. Cases cited by the plaintiffs, such as Interstate Commerce Commission v. Louisville & Nashville Railroad Co., 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431; New York & Queens Gas Co. v. McCall, 245 U. S. 345, 38 S. Ct. 122, 62 L. Ed. 337; and Manufacturers' Railway Co. v. United States, 246 U. S. 457, 38 S. Ct. 383, 62 L. Ed. 831, although they involve statutes which provide for a public hearing, sustain the general principle that

in the exercise of the rate-making power by administrative bodies, a hearing must be accorded the parties affected in order to afford due process of law. The same constitutional question, from a somewhat different viewpoint, is raised by the plaintiffs when they assert that, since the commission made the order complained of without legal evidence to support it, the order is necessarily void. See United States v. Abilene & Southern Railway Co., 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016. The necessity for a hearing when the commission exercises its rate-making power over public service corporations is pointed out by Mr. Justice Cardozo in Norwegian Nitrogen Products Co. v. United States, 288 U. S. 294, 53 S. Ct. 350, 77 L. Ed. 796, decided February 6, 1933. In Atchison, Topeka & Santa Fé Railway Co. v. United States, 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273, it was held that a fair hearing is a fundamental requirement in the discharge by the commission of its duty of determining reasonable rates.

We are forced to the conclusion that the attempted delegation by Congress of its power to establish rates without a public hearing is unconstitutional. The Supreme Court, in Hampton, Jr., & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 351, 72 L. Ed. 624, said: "Again, one of the great functions conferred on Congress by the Federal Constitution is the regulation of interstate commerce and rates to be exacted by interstate carriers for the passenger and merchandise traffic. The rates to be fixed are myriad. If Congress were to be required to fix every rate, it would be impossible to exercise the power at all. Therefore, common sense requires that in the fixing of such rates Congress may provide a Commission, as it does, called the Interstate Commerce Commission, to fix those rates, after hearing evidence and argument concerning them from interested parties, all in accord with a general rule that Congress first lays down that rates shall be just and reasonable considering the service given and not discriminatory. As said by this Court in Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 214, 32 S. Ct. 436, 441, 56 L. Ed. 729: 'The Congress may not delegate its purely legislative power to a commission, but, having laid down the general rules of action under which a commission shall proceed, it may require of that commission the application of such rules to particular situations and the investigation of facts, with a view to making orders in a particular matter within the rules laid down by the Congress.'"

While it is well settled that Congress may delegate to the Interstate Commerce Commission, as an administrative tribunal, the power to fix rates, provided they are just and reasonable, that result can be lawfully accomplished by the commission only after a fair and full hearing of the carriers affected.

A final decree may be entered in accordance with this opinion, and a permanent injunction issued setting aside, annulling, and suspending the order of the commission.

NIELDS, District Judge (concurring).

I concur in the result reached by Judge THOMPSON that section 3 (e) of the amendment to the Inland Waterways Corporation Act, known as the Denison Act (49 USCA § 153(e), violates the Fifth Amendment to the Constitution of the United States and, consequently, that the second supplemental order of the Interstate Commerce Commission, here complained of, is void.

In my opinion, the deprivation of property that plaintiffs will suffer is not "short-hauling" over their all-rail routes. That loss might well be the result of wholesome water competition. But the second supplemental order of the commission directs the plaintiffs to participate with the American Barge Line Company in joint through rail-barge-rail and barge-rail rates on cotton in carloads upon a basis of 8, 6, and 4 cents lower than the all-rail rates between designated points. This is nothing less than rate-making in which plaintiffs are forcibly required to participate. The order is directed against plaintiffs, "limiting their powers in the transaction of their business" and is a deprivation of property within the Fifth Amendment. Norwegian Nitrogen Co. v. United States, 288 U. S. 294, 318, 53 S. Ct. 350, 77 L. Ed. 796.

The due process or hearing guaranteed by that amendment is not afforded in the Denison Act and cannot be imported into the text of the act. It is true that the commission may only "fix reasonable minimum differentials between all rail rates and joint rates in connection with said water service * * * " and may only establish "equitable divisions" of the joint differential rates. If it were sought to imply a hearing before order from this language, the implication is negatived by the express provision of the act for a hearing of complaints after order filed.

The hearing by the commission after the filing of its order is a hearing after deprivation of property and is not the hearing guaranteed by the Constitution. It may well be where the administration of the taxing power has been delegated to a commission public necessity requires that due process be afforded after the imposition or even after the payment of the tax. Hagar v. Reclamation District No. 108, 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569; Standard Oil Co. of California v. McLaughlin (D. C.) 55 F.(2d) 274, 277. No such public exigency exists where, as here, the purpose of the act is "to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation." 49 USCA § 142, 41 Stat. 499.

DICKINSON, District Judge (dissenting).

Except for one underlying thought, we would be able to follow the majority opinion to its conclusion. Not being in accord with this underlying thought, we must dissent.

The thought is that railroad carriers have a property right in the prospective traffic which might or would (except for some complained of act of another) pass by their lines. This is the same claim of property right which the ox team and pack horse asserted against steam transportation, the stagecoach against the trolley, and which now in turn the railroads are asserting against the gas engine, motortruck, and bus. It may be that all of them will in the near future combine in the attempt to enforce such a right against air carriers.

It is unnecessary to inquire into the validity of such a claim of right because the complainants have expressly disclaimed it and the majority opinion does not avow it. It seems to us, however, that it underlies the ruling made because this is based upon the unconstitutionality of the act of Congress, under authority of which the commission acted in making the order, the enforcement of which is enjoined, and the unconstitutionality consists in that the order deprives the complainants of property without due process, etc. The logic of the situation is that if they have a property right they should have protection, but if they have no property right they have no legal or equitable right of complaint. The property interest of a carrier in compensation for the carriage of traffic committed to it is undoubted. Whether it has a like property right in prospective traffic is another question. The sole question here is the existence of the latter right.

An outline and very general statement of the fact situation, it seems to us, makes this clear. There is a traffic between the Atlantic

and Pacific Coasts. There are established railroad line carriers which have been taking care of this traffic and will, if permitted, continue to do so. This traffic, or a part of it, may be visualized as carried by existing railroads from the Pacific Coast to the Mississippi river where the Ohio empties into it. If we then think of the traffic as transported northwardly by one line of railroad to its junction with the Pennsylvania Railroad and over it eastwardly through Pittsburgh to the Atlantic Coast, we have a sufficiently general idea of the pre-order situation. The Ohio river extends from its junction with the Mississippi northeastwardly to and beyond Pittsburgh and is navigable at least to Pittsburgh. If we think of the line of the first railroad we have mentioned and of the Pennsylvania railroad as forming the legs of a right angle triangle, the Ohio river would be the hypothenuse. A barge line water route has been established on the Ohio river. Any one can foresee that if the all-rail route from coast to coast traffic is diverted to a rail and water route to Pittsburgh and a rail route to the Atlantic, the railroad first mentioned may lose all of this through traffic and the Pennsylvania that part of it formerly carried by the first mentioned railroad except only as the Pennsylvania would continue to carry it east from Pittsburgh.

The situation of the railroads mentioned is typical of all and shows the real nature of the damnum of which complaint is made and that it relates to what we have called prospective traffic. The damnum is unquestioned and is not merely speculative but actual. The sole question is whether there is likewise an injuria. If, as before stated, the complainants have a property right in this prospective traffic which they will lose, they have suffered not merely a loss but a legal injury.

Inasmuch, however, as it is conceded that no such right exists, we are unable to see how the decree in question can deprive the complainants of property which has no existence. If we were dealing with a statute which gave the right to a hearing before a preliminary order could be made, we would concede that the question of a property right did not arise. The statute, however, is, and we think correctly, construed to permit of the order without a hearing, and thus the sole question is its constitutionality and its constitutionality turns upon the question of a deprivation of property without compensation or otherwise without due process. The existence of the property right thus becomes pivotal.

We think the bill should be dismissed.