T. M. DUCHE & SONS *v.* UNITED STATES (No. 4676)[1]

---

[1] C. A. D. 485.

United States Court of Customs and Patent Appeals, March 18, 1952

*Barnes, Richardson & Colburn* (*Albert MacC. Barnes* and *J. Bradley Colburn* of counsel) for appellant.

*David N. Edelstein*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs

188

Court, Third Division (one judge dissenting), in conformity with its decision, C. D. 1300, overruling a protest of appellant against the assessment of duty at the rate of 27 cents per pound on an importation of dried egg albumen under the provisions of paragraph 713 of the Tariff Act of 1930 as amended by a proclamation of the President, T. D. 44997, made pursuant to section 336 of said act.

Appellant claimed the imported merchandise to be properly dutiable at 18 cents per pound, which is the rate for dried egg albumen as provided for in the Tariff Act of 1930.

No evidence was introduced at the trial but it was stipulated as follows:

It is hereby stipulated and agreed by and between the attorneys for the parties hereto that the record in the case of *T. M. Duche & Sons, Inc.* v. *United States*, Suit 4576 reported in 36 C. C. P. A. (Customs) 19, C. A. D. 391 may be incorporated herein and the above-entitled protest be submitted for decision. [Italics supplied.]

The record in suit 4576, *supra*, incorporates, in turn, the record in *T. M. Duche & Sons et al.* v. *United States*, 13 Cust. Ct. 26, C. D. 863, and *David L. Moss Co., Inc.* v. *United States*, 26 C. C. P. A. (Customs) 381, C. A. D. 45. Included in that record are a copy of Senate Resolution 389, 71st Congress, Third Session, directing the Tariff Commission to investigate the difference in costs of production of dried whole eggs, dried egg yolks, and bried egg albumen under section 336 of the Tariff Act of 1930; a copy of the public notice of investigation issued by the Tariff Commission; a copy of the testimony taken at the public hearing held by the Commission; photostatic copies of the documentary exhibits introduced in the Commission's investigation; photostatic copies of depositions taken of witnesses not in attendance at the public hearing; and report of the Tariff Commission, No. 25, entitled "Report to the President on Dried Egg Products."

The issues are the same as those in the case of *T. M. Duche & Sons, Inc.* v. *United States*, 36 C. C. P. A. (Customs) 19, C. A. D. 391, except that in this case appellant presents a new issue of whether under the Administrative Procedure Act, 5 U. S. C., section 1001, *et seq.*, it is the right and duty of this court and the Customs Court to review the proceedings before the Tariff Commission to determine if there was substantial evidence in the record to establish compliance with the statutory prerequisites for the issuance of a presidential proclamation changing the tariff rates on the imported merchandise.

The brief for appellant states:

* * * In asking the Court to review this matter again it should be made clear that appellant is not asking a review of the factual findings and conclusions of the Tariff Commission nor is it asking the Court to weigh the evidence before the Commission nor to substitute its opinion or discretion for that of the Commission and the President.

The protest herein is based upon the claim that there is no validity in the entire proceedings of the Tariff Commission and the President; that the tariff changing powers delegated by the Congress in said Section 336 were strictly defined and limited, that the Tariff Commission has exceeded such statutory limits, and its investigation and findings and the proclamation of the President based thereon are illegal, null and void because of failure to follow and stay within such express jurisdictional requirements.

It will be noted that the question of the jurisdictional requirements of section 336, *supra*, were passed upon adversely to appellant's contention in *T. M. Duche & Sons, Inc.* v. *United States*, 36 C. C. P. A. (Customs) 19, *supra*, insofar as the provisions of the Tariff Act of 1930 are concerned. We adhere to our decision in that case and think it unnecessary to discuss in this opinion the issues there involved.

The one new remaining issue is that regarding the applicability of the Administrative Procedure Act, *supra*.

Section 1009 of that act contains the following provisions:

### Judicial review of agency action

Except so far as (1) statutes precluded judicial review or (2) agency action is by law committed to agency discretion.

### Rights of review

(a) Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.

   \*       \*       \*       \*       \*       \*       \*

### Acts reviewable

(c) Every agency action made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review. Any preliminary, procedural, or intermediate agency action or ruling not directly reviewable shall be subject to review upon the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final shall be final for the purposes of this subsection whether or not there has been presented or determined any application for a declaratory order, for any form of reconsideration, or (unless the agency otherwise requires by rule and provides that the action meanwhile shall be inoperative) for an appeal to superior agency authority.

   \*       \*       \*       \*       \*       \*       \*

### Scope of review

(e) So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege or immunity; (3) *in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5)*

*unsupported by substantial evidence* in any case subject to the requirements of sections 1006 and 1007 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error. [Italics added.]

Section 1001 of that act relates to definitions and states:

As used in this chapter—

Agency

(a) "Agency" means each authority (whether or not within or subject to review by another agency) of the Government of the United States other than Congress, the courts, or the governments of the possessions, territories, or the District of Columbia. Nothing in this chapter shall be construed to repeal delegations of authority as provided by law. * * *

It is apparent from the above definition that Congress, the courts, and the governments of the possessions, territories, and the District of Columbia are not federal "administrative" agencies within the purview of that act.

The courts have held that the President, acting under the flexible tariff statute, cannot be regarded as an administrative agency, but is an agent of Congress. *J. W. Hampton, Jr., & Company* v. *United States*, 276 U. S. 394, 411. In that case the Court stated:

* * * What the President was required to do was merely in execution of the act of Congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect.

In *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 305, the Court stated:

* * * What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the legislative process. *Hampton & Co.* v. *United States* 276 U. S. 394; *Buttfield* v. *Stranahan, supra; Field* v. *Clark*, 143 U. S. 649. * * *

Referring to hearings by the Interstate Commerce Commission, Public Service Commissions, and like tribunals, as distinguished from the Tariff Commission, the Court said:

* * * The Tariff Commission advises; these others ordain. There is indeed this common bond that all alike are instruments in a governmental process which according to the accepted classification is legislative, not judicial. *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 226; *Keller* v. *Potomac Electric Power Co.*, 261 U. S. 428, 440. Cf. *People ex rel. C. P. R. Co.* v. *Willcox*, 194 N. Y. 383, 386; 87 N. E. 517. Whatever the appropriate label, the kind of order that emerges from a hearing before a body with power to ordain is one that impinges upon legal rights in a very different way from the report of a commission which merely investigates and advises. The traditional forms of hearing appropriate to the one body are unknown to the other. What issues from the Tariff Commission as a report and recommendation to the President, may be accepted, modified or rejected. If it happens to be accepted, it does not bear

fruit in anything that trenches upon legal rights. No one has a legal right to the maintenance of an existing rate of duty. Neither the action of Congress in fixing a new tariff nor that of the President in exercising his delegated power is subject to impeachment if the prescribed forms of legislation have been regularly observed. * * *

While the *Norwegian Nitrogen Products Co.* case, *supra*, did not involve a review of the action of the Tariff Commission under the Administrative Procedure Act, it so clearly defined the scope and duties of the Tariff Commission and the function it serves under section 315 of the Tariff Act of 1922, that we consider it a decisive authority on the issue here in controversy.

In *United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371, it was held that neither the action of the President, taken pursuant to section 336 of the Tariff Act of 1930, nor the hearing of the Tariff Commission upon which such action was based was subject to judicial review if the statutory authority authorizing such action had been followed. In that case the Court stated:

* * * the judgment of the President that on the facts, adduced in pursuance of the procedure prescribed by Congress, a change of rate is necessary is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment. * * *

Appellant's contention that it is entitled to a judicial review of the procedure of the Tariff Commission under the Administrative Procedure Act is predicated upon its claim that it is "a person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action." We think appellant has suffered no legal wrong because, as stated by the Supreme Court in the *Norwegian Nitrogen Products* case, *supra*, "No one has a legal right to the maintenance of an existing rate of duty." The action of the Tariff Commission being advisory only, its advice that the rate of duty should be increased cannot be considered to "adversely affect" appellant because it is only when the President acts upon that advice that appellant could be affected and, as above set out, the action of the President "is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment." Certainly the action of the Tariff Commission can be reviewed to determine whether or not it followed the statutory formula in compiling its report to the President. That is provided for by section 514 of the Tariff Act of 1930 and such a review was had by appellant in the previous *Duche* case, *supra*, reported in 36 C. C. P. A. (Customs) 19 C. A. D. 391. In our opinion, the Administrative Procedure Act did not broaden the scope of review to which appellant is entitled under section 514, *supra*. We think that act does not authorize a judicial review of the proceedings before the Tariff Commission or of the discretionary acts of the President.

The decision of the Customs Court is therefore *affirmed*.

O'CONNELL, J., dissents.

———

GARRETT, Chief Judge, dissenting:

This is the third case relating to the treatment of dried egg albumen for tariff purposes, wherein section 336 of the Tariff Act of 1930—the flexible tariff provision—has been involved, to reach this court.

The first case was that of *David L. Moss Co., Inc.* v. *United States,* decided March 27, 1939, and reported in 26 C. C. P. A. (Customs) 381, C. A. D. 45. The second headnote to our decision there reads:

The validity of a Presidential proclamation issued under section 336, Tariff Act of 1930 (raising the tariff rate on dried egg albumen, among other commodities), is challenged on the ground that the report of the United States Tariff Commission and the facts secured by the commission in its investigation establish that dried egg albumen was not a "domestic article" within the meaning of those words as used in said section 336. A majority of the court concurs in the view that, while it is not the function of the court to weigh the evidence and determine the facts, it may go behind the report of the commission, which is before the court, to determine whether the finding of the President and the commission that dried egg albumen was such a domestic article is supported by any substantial evidence. Citing *Shields* v. *Utah Idaho Cent. R. R. Co.*, 305 U. S. 177.

The author of the prevailing opinion was Honorable John J. Parker, Senior Judge of the United States Circuit Court of Appeals for the Fourth Circuit, and the late Judge Irvine L. Lenroot concurred in his opinion.

The late Judge Charles S. Hatfield did not agree with the holding quoted from the headnote, *supra*, but concurred in the conclusion.

The late Judge Oscar E. Bland and I agreed with that holding and dissented from the conclusion because, in our opinion, the facts appearing did not disclose the existence of a domestic dried egg albumen industry within the purview of the statute.

In the course of my dissenting opinion in the case, I said:

The strongest statement, indeed practically the only statement, to be found in the report as to the amount of dried egg albumen produced domestically during the representative period, is contained in a footnote in that part of the report where the commission summarized its findings, which footnote reads:

In 1929 one company tray-dried about 100,000 pounds of liquid whites, *partly to salvage them.* In 1931 another company, by a modified spray method which eliminates the pressure nozzle, and by a painstaking heat control, asserts that it has developed a method which is adapted to mass production methods and labor costs in the United States. [Italics quoted.]

It will be noted that the statement relative to what was done in 1931 (which incidentally was not one of the years embraced in the representative period) does not include any actual production but merely indicates a possibility of production. The poundage (100,000 pounds) stated to have been dried in 1929 (the only year of the representative period in which the report shows any to have been produced) was the weight of the whites before drying. The weight after drying, as is stated in the opinion by Judge Parker, was approximately 10,000 pounds. It seems from

statements in the report that the importations of dried egg albumen during the three years of the representative period were in excess of ten million pounds. So, the domestic production was only one-tenth of 1 per centum of the total amount consumed. The report is replete with statements indicating clearly that the productions of dried egg albumen during the representative period were merely experimental in character. This is confirmed by the statement in the opinion of Judge Parker, based upon an independent examination of the testimony taken by the commission, saying. "It is true that there was very little evidence as to production of dried egg albumen, and most of this was as to production of an experimental character." I have no quarrel with the finding immediately following the above to the effect that the feasibility of production was established; also, I agree that production costs were ascertained, but those were the costs of the purely experimental productions. There was, as I view it, no other kind of production shown.

In the opinion by Judge Parker it is assumed, without deciding, "that it was the intention of Congress that duties should be raised under the flexible provisions of the tariff act only in cases where a domestic industry was in existence which Congress desired to protect, and that it was not intended that the commission should increase duties in an attempt to bring new industries into existence." For reasons succinctly stated by Judge Bland in his dissenting opinion, I agree with him that the assumption as stated is correct, and I would definitely hold it to be a part of the law of the case, as I also would the further assumption stated in the opinion by Judge Parker, "that sporadic or experimental production would not satisfy the test of an existing domestic industry."

The following I take from the dissenting opinion of Judge Bland:

Now, being in agreement with the leading opinion that we may go to the record made before the Tariff Commission under the circumstances at bar, the issue is squarely presented: Does the record, which contains no conflicting testimony, and all of the facts submitted to the commission, support the conclusion that there was a domestically produced *article* which would warrant the President in issuing the proclamation. I have carefully considered not only the evidence emphasized by the commission in its report to the President, and that which is pointed out in the leading opinion, but I have considered every other phase of the testimony and I am unable to arrive at a conclusion that during the representative period, or at any time thereafter, there was such an American industry producing such a domestic article as Congress had in contemplation when section 336 was enacted. I find no substantial evidence in the record from which the commission or the President might properly conclude that there was such an article produced. *It seems to me that the leading opinion suggests, if it does not definitely hold, that such an industry could not possibly have existed in the face of such devastating competition.* [Italics quoted.]

The provisions of section 336 were intended to apply to an established American industry producing an article, the cost of production of which might be fairly compared with the cost of production of the foreign article. If the domestic production was sporadic and inconsequential to the extent that the production costs were so unnecessarily high as not to be fairly comparable with production costs abroad, no remedy, in my judgment, is afforded by the provision. We are here concerned with the evidence relating to the production of dried egg albumen. * * *

As may seem from the respective dissenting opinions of Judge Bland and myself, it was our view that section 336 of the 1930 Tariff Act was enacted in the interest of actually existing domestic industries and

that it was not contemplated by the Congress it would be invoked to build up industries when none previously existed.

The second case to reach this court was that of *T. M. Duche & Sons, Inc.* v. *United States*, 36 C. C. P. A. (Customs) 19, C. A. D. 391, decided November 2, 1948. It was virtually a retrial of the issues involved in the *Moss* case, *supra*, the record of which was included in it through another *Duche* case (the record of which was included), which had been tried before the Customs Court but not appealed to this court.

As pointed out in the majority opinion in the instant case, the records in the two *Duche* cases, *supra*, and that in the *Moss* case, *supra*, were made a part of the record in the instant case.

Only two of the judges (Hatfield and I) who had participated in the *Moss* case, *supra*, participated in the *Duche* case, *supra*. Judge O'Connell had succeeded Judge Lenroot and Judge Johnson had succeeded Judge Bland. The opinion was written by Judge Jackson in whose place Circuit Judge Parker acted in the *Moss* case, *supra*.

The majority of the court overruled that portion of the decision of the majority in the *Moss* case, *supra*, which held that the courts might go behind the report of the Tariff Commission to determine whether its finding that dried egg albumen was a "domestic article," within the purview of section 336 of the Tariff Act of 1930, was supported by any substantial evidence, and adhered to the conclusion of the majority in the *Moss* case, *supra*, on the factual issue presented, thus overruling appellant's protest. The decision of the Supreme Court in the case of *United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371, T. D. 50159, reversing a decision of this court, was held to be controlling, along with that in the case of *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, which had been cited and relied on by Government counsel in the *Moss* case, *supra*.

I did not agree that the decisions in those cases were controlling and, being still of the opinion that no dried egg albumen industry was shown to have existed in the United States during the representative period required to be considered, again expressed dissent.

I have restudied the issues, in the light of the argument presented in the instant case, but am not convinced that the position I took originally was erroneous.

In consequence, I again respectfully dissent.