34588.   YEARTY *v.* GENERAL WHOLESALE COMPANY.

DECIDED MAY 13, 1953—REHEARING DENIED JUNE 12, 1953.

400

*Poole, Pearce & Hall, Wilmer D. Lanier, Margaret H. Fairleigh,* for plaintiff in error.

*Calhoun & Calhoun,* contra.

FELTON, J. The duties of the employee concerned are determinative of the issue as to whether that employee comes within the terms of the National Fair Labor Standards Act, and not the general nature of the business as a whole or of any particular office, branch, or group of employees. *Pyron* v. *Arnold,* 67 *Ga. App.* 742 (21 S. E. 2d 461). The defendant is a wholesale liquor distributor. The defendant purchases its liquors and alcoholic beverages from points outside Georgia. Pursuant to Code (Ann. Supp.) §§ 58-1013, 58-1014, and 58-1015, the liquors so purchased are first stored in a State warehouse for the purpose of affixing State liquor stamps. The defendant then makes withdrawals from the State warehouse for restorage and processing in its own warehouse. The question for determination is whether a "substantial part" of the plaintiff's employment activities related to goods moving in interstate commerce. *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 572 (63 Sup. Ct. 332, 87 L. ed. 460). What constitutes a "substantial part of an employee's activities related to goods whose movement [is] in the channels of interstate commerce" has caused no small amount of differences in opinion. The plaintiff in error cites an interpretative bulletin of the U. S. Department of Labor, Wages and Hours Division, which reads in part: "The Act applies to employees 'engaged in commerce or in the production of goods for commerce' without regard to whether such employees, or their employer, are also engaged in other activities which would not bring them within the coverage of the Act. The Act makes no

distinction as to the percentage, volume, or amount of activities of either employee or employer which constitute engaging in commerce or in the production of goods for commerce. . . Although employees doing work in connection with mere isolated, sporadic, or occasional shipments in commerce of insubstantial amounts of goods will not be considered covered by virtue of that fact alone, the law is settled that every employee whose engagement in activities in commerce or in the production of goods for commerce, even though small in amount, is regular and recurring, is covered by the Act." While applicable interpretations by the Wage and Hour Administrator must be given considerable weight in arriving at a proper definition of the scope of a provision of the Fair Labor Standards Act (Anderson *v.* Manhattan Lighterage Corp., 148 Fed. 2d 971 (2)), it is for the courts, in the final analysis, to determine the coverage of the act. Kirschbaum Co. *v.* Walling, 316 U. S. 517, 523 (62 Sup. Ct. 1116, 86 L. ed. 1638); Skidmore *v.* Swift & Co., 323 U. S. 134, 137 (65 Sup. Ct. 161, 89 L. ed. 124). Contrary to the Administrator's holding in the above-quoted bulletin, we do not think the Supreme Court's pronouncement in Walling *v.* Jacksonville Paper Company, supra, that the test of an employee's coverage by the act is whether a substantial part of his employment activities relates to goods in commerce or produced for commerce completely excludes the consideration of "the percentage, volume or amount of activities of either employee or employer" in arriving at the answer of whether the employee's activities are substantial. See Jax Beer Co. *v.* Redfern, 124 Fed. 2d 172; Schwarz *v.* Witwer Grocer Co., 49 Fed. Supp. 1003; Owin *v.* Liquid Carbonic Corp., 42 Fed. Supp. 774 (4). The Administrator's own interpretative bulletins are somewhat in conflict as to what is meant by "substantial." One is to the effect that substantial means "Any amount of work in excess of 20 percent of the total number of hours worked by the particular employee within a particular work week." Interpretative Bulletin No. 9, U. S. Department of Labor, Wages and Hours Division. "Incidentally, under the official regulations of the Wage-Hour Administration part 541, Par. 31301.-05 Vol. 2, Labor Law Service, 20 percent seems to be the amount hit upon in distinguishing who are and who are not salesmen." Anuchick *v.* Transamerican Freight

Lines, 46 Fed. Supp. 861, 865 (4). "But the applicable interpretation by the Wage and Hour Administrator, to which we must give considerable weight in arriving at a proper definition of the scope of the exemption now before us . . . excludes therefrom 'barge tenders on non-self-propelled barges' who 'do a substantial amount of nonexempt work' such as 'loading and unloading and activities relative thereto' . . . The word 'substantial' denotes a comparison based on a ratio of nautical to longshore duties." Anderson v. Manhattan Lighterage Corp., 148 Fed. 2d 971, 973.

The plaintiff testified in part: "During the period that I worked at General Wholesale in Atlanta I checked drivers and did the government books. The government books is an account-ability of wine gallons and a copy of all incoming and outgoing merchandise. When I say wine gallons, that's the number of gallons that go to make up a case of whisky and each case has to be accounted for when it comes in and each case accounted for as it is delivered to customers. Accounted for to the Federal government, and also to the State. You asked me exactly what I [sic] did my work in accounting for these cases consist of. Well, if it was an incoming invoice we figured the total number of cases in gallons and entered that on what they call a 52-A book. The 52-A book is for incoming merchandise. Now, for outgoing merchandise each individual invoice had to be broken down according to the distilleries, according to the number of gallons and distributed on the books, and then a grand total of all invoices and all books had to agree. A copy of that record was mailed to the Federal government and a copy was mailed to the State, and the company kept a copy. I made up that report. . . You asked me what else I did besides keeping these government books. Well, I figured a few payrolls—well, in fact, I figured all the warehouse payroll and checked drivers in with their cash and made up deposits. I checked the drivers in with their cash after making deliveries to the retail stores. The drivers would obtain the merchandise from the General Wholesale's warehouse to deliver. The warehouse was located the same place as the office. . . I would say half of my time each day was consumed in keeping these government books. You asked me, 'How much of your time in

making these deposits and checking in these amounts from the drivers, and so forth that you just stated?' Well, everything else included, that was deposits and checking drivers, and so forth, took up the balance of my time. . . The law requires shipment of liquor to go to a State warehouse first. I got the invoices from Illinois and Pennsylvania, and so forth, but the delivery of the liquor was to the State warehouse first and we drew it out of the State warehouse as we needed it. . . You asked me, 'Mr. Yearty, will you describe just the procedure that's followed when merchandise is shipped in to the General Wholesale? Just what procedure is followed in getting it into the warehouse and out of the warehouse, to your knowledge?' First it comes to the State warehouse in its shipment. . . We would know a shipment is there because the State warehouse would call, or I would get—sometimes I would get a copy of the invoice, and sometimes I would get a shipping manifest; and in that way I knew it was up there. The State warehouse handled it entirely, unless—unloaded it and placed it in their warehouse, except those times, there, that maybe a truck-load would be delivered to our warehouse. But a State man had to accompany it along to see that it was stamped and as coming into the State of Georgia. I have been present when shipments were unloaded in the State warehouse. Not too many occasions. I had to go up as a general rule to look over damaged merchandise on every one of them, but I wasn't there at all times when they were unloading. When merchandise was damaged I filed claim with the railroad or whoever handled it in there. I sent Mr. Pierce a copy of the damages. I would list down what it was. I didn't have anything to do with filing the claim. As we needed merchandise we would draw it out of the State warehouse, so many cases at a time. To go about drawing it out we would make out an outgoing order and send our truck to the State warehouse, accompanied with the draft, and the State warehouse would load our truck according to our outgoing order and accept the draft in payment. I had to go to the State warehouse several different occasions. Lot of times you have to take serial numbers on merchandise that was coming back to Atlanta, or merchandise being shipped somewhere else. I would have to go there to check inventory every month. These withdrawals

from the State warehouse would come to our warehouse, to be redistributed to the retailer. The retailer was the only points to which we distributed it. It came to our warehouse and the orders were filled from that stock and delivered to the retail stores. Our truck drivers delivered it to the retail stores; occasionally I had some duties to do in connection with that. I checked the merchandise as it was being put on the truck; see that it was all there and correct. . . You asked me how much of each day I spent on these government books. That was our biggest problem, was help. I would say I spent easy half of my time either figuring gallons—whether I wrote them down, or not, I spent a mighty lot of time checking them. I worked on these government books every day. They have to be entered within 24 hours after the merchandise is delivered. I worked on these government books every day that we were open. . . When I referred to government books, those were the 'A' and 'B' books that I referred to."

Ida Jannoulis testified on behalf of the plaintiff in part as follows: "I have been employed by General Wholesale Company. I was employed by them for almost six years, ending in 1951. . . Mr. J. C. Yearty worked there during the period that I worked there. I was acquainted with him. At the time that he was there as I recall he worked on the 1952 'A' and 'B' books; government books. They are a summary of receipts and sales of whisky in gallons. I guess that's what you would call it. And he made deposits and—those books were a government record of all the receipts of whisky, all purchases, was the 52-A book. The 52-B book was a book showing the withdrawals or merchandise that was sold or shipped out. I worked in the office at General Wholesale. I did general clerical work, secretarial work; kept inventory records and I did work indirectly with that 52-A and B book. At one time I kept the records myself. I think before Mr. Yearty came to work there was a Mr. Mc-Kennon. I think after the time Mr. McKennon kept the records, I did. I was familiar with them. . . I am familiar with the work that Mr. Yearty did. I saw him working. I saw him working on these government books. I couldn't say for sure how much of his time he spent working on those books. Maybe a half of the time. . . The keeping of the 'A' book is a rela-

tively small job, in the matter of time, with the General Whole-sale Company. I would say I didn't even devote thirty minutes a day to the keeping of the 'A' book, when I was keeping those books at the General Wholesale Company. I would say that this same fifteen or twenty minutes per day was devoted by Mr. Yearty to the keeping of the 'A' book when he kept them."

We concern ourselves now with when the defendant's goods ceased to be in interstate commerce. In Fleming v. Jacksonville Paper Co., 128 Fed. 2d 395 (9), 398, the court said: "Without reviewing the multitude of decided cases as to when interstate transportation ends (see 11 Am. Jur., Commerce, especially §§ 43, 45, 62, 63, 64, 66, 69, 71, 74), we are justified in holding that after imported goods are delivered to and received by the importer, and become part of his property held within the State subject to his disposition, whether in the original containers or not, the subsequent sale and delivery of them within the State is intrastate commerce. The typical case is a stock of goods in a warehouse awaiting sales. It does not matter that the goods were imported with a view to selling them afterwards to particular customers, or that according to past experience they would likely be sold to them, or would surely be sold to someone very soon. If they come to rest in the hands of the importer, they have ceased to be in interstate commerce because of their importation, and his employees thereafter engaging solely in selling them within the State are not employed in interstate commerce." This case was certioraried to the United States Supreme Court as Walling v. Jacksonville Paper Co., 317 U. S. 564, supra. The Supreme Court divided the products handled by the Jacksonville Paper Company into three categories. The first two categories were products which were "ordered pursuant to a preexisting contract or understanding with the customer." As to these two groups the court held that the mere handling of the products or the temporary storage thereof by the paper company did not break the continuity of their interstate ship-ment and change their status from interstate to intrastate com-merce. However, as to the third category of products handled by the paper company—that treated by the Circuit Court of Appeals in division 8 of Fleming v. Jacksonville Paper Co., supra—the Supreme Court said: "Finally, the Administrator

contends that most of the customers form a fairly stable group, that their orders are recurrent as to the kind and amount of merchandise, and that the manager can estimate with considerable precision the needs of his trade. It is therefore urged that the business with these customers is 'in commerce' within the meaning of the Act. Some of the instances to which we are referred are situations which we have discussed in connection with goods delivered pursuant to a prior order, contract, or understanding. For the reasons stated they must be included in the group of transactions held to be 'in commerce.' As to the balance, we do not think the Administrator has sustained the burden which is on a petitioner of establishing error in a judgment which we are asked to set aside. We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' within the meaning of the Act. It was said in Swift & Co. v. United States, 196 U. S. 375, 398, that 'commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business.' While that observation was made apropos of the constitutional scope of the commerce power, it is equally apt as a starting point for inquiry whether a particular business is 'in commerce' within the meaning of this Act. We do not believe, however, that on this phase of the case such a course of business is revealed by this record. The evidence said to support it is of a wholly general character and lacks that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition."

Under these rulings, for the purposes of the act, the defendant's goods ceased to be in interstate commerce when they reached the defendant's warehouse where they were brought from the State warehouse for restorage, processing, and delivery to the retailers. Consequently, the keeping of records on incoming shipments of liquor dealt with goods in interstate commerce, but the records kept on outgoing goods shipped to retailers pertained to goods that were no longer in interstate commerce. See Jax Beer Co. v. Redfern, 124 Fed. 2d 172. The plaintiff depends al-

most entirely on his keeping of the "government books" on wine gallons received and disbursed to show his activities in interstate commerce. To finally determine the question under consideration, we examine the time spent by the plaintiff on the "government books" in dealing with the goods while they were of interstate nature, and the time spent thereon when they had ceased to be "in commerce." The plaintiff testified that he spent at least half his employment time on the "government books," but he did not testify as to how much of that time he spent on "Book A," which dealt with the receipt of the goods, and how much of that time he spent on "Book B," which dealt with the disbursement of such goods. He testified: "When I referred to the government books, those were the 'A' and 'B' books that I referred to." The only evidence on this point is the testimony of Ida Jannoulis, the plaintiff's own witness. She testified that the plaintiff spent from fifteen to twenty minutes a day on the "Book A." This is not disputed. Therefore, the plaintiff spent only fifteen to twenty minutes a day in the keeping of records on the defendant's goods while they were "in commerce." The remainder of the time he spent on the "government books" concerned the goods after they had lost their interstate-commerce status. The plaintiff contends that the time testified by Ida Jannoulis spent by the plaintiff in keeping the "A" book, that is, from fifteen to twenty minutes a day, did not include that time spent by him on preparing the calculations which were to be entered into the "A" book. In other words, the plaintiff construes such testimony to mean that he spent fifteen to twenty minutes a day. making physical entries in such book. Assuming for the sake of argument that such construction is a correct one, nowhere in the evidence is it shown how much time was spent on such calculations, nor does the evidence contain any data from which a jury could determine how much time the plaintiff spent in making such calculations preparatory to entering them in the "A" book; therefore it would be a matter of mere conjecture and speculation as to how much time was spent in making such calculations. "The weight of authority clearly indicates that when the employee works both in intrastate and interstate commerce, the burden is upon him to point out what part of his work was in intrastate and what part in interstate . . . work

and when performed." Schwarz *v.* Witwer Grocer Co., supra; Super-Cold Southwest Co. *v.* McBride, 124 Fed. 2d 90, 93; Maitrejean *v.* Metcalfe Construction Co., 165 Fed. 2d 571, 574; Jax Beer Co. *v.* Redfern, supra; Owin *v.* Liquid Carbonic Corp., supra. In the instant case, the only evidence which would authorize a finding as to how much time the plaintiff spent on goods in interstate commerce is that the plaintiff spent from fifteen to twenty minutes a day on the "A" book. Under the cases just cited above, we do not believe that this time constituted a substantial part of the plaintiff's employment activities, such as would bring him within the operation of the National Fair Labor Standards Act (29 U.S.C.A. § 207).

The court did not err in awarding a nonsuit.

*Judgment affirmed. Sutton, C. J., and Worrill, J., concur.*