STEPHENS et al.
v.
COTTON PRODUCERS ASS'N et al.
Civ. No. 741.

United States District Court
N. D. Georgia, Rome Division.
Nov. 4, 1953.

John D. Edge, Calhoun, Ga., for plaintiffs.

Alston, Sibley, Miller, Spann & Shackelford, Atlanta, Ga., for defendant.

HOOPER, District Judge.

The above case is a companion case with Civil Action No. 728, John A. Nix and J. P. Wilson v. The Farmers Mutual Exchange of Calhoun, Inc., and the cases were tried together. In each case plaintiffs seek to recover unpaid minimum wages and overtime payments pursuant to the Fair Labor Standards Act. In this case The Cotton Producers Association was joined as a party defendant but was stricken by the court at the conclusion of the testimony, leaving both cases pending against Farmers Mutual Exchange, hereinafter referred to as Farmers Mutual.[1]

With the above defendant stricken there is no material difference in the two cases excepting that it appeared that plaintiff Johnston in case No. 741 was the only employee who drove the trucks of said defendant, thereby raising a question as to his case not pertinent to the other case.

The defendant Farmers Mutual admitted upon the trial of the case that plaintiffs during the summertime worked about 65 hours per week and during the wintertime about 60 hours per week, but set up in its answer several reasons why it was exempt from provisions of said Act and these exemptions, hereinafter more fully discussed are as follows:

(1) That defendant was a retail establishment and that the Act did not apply with respect to any employee employed by it, 29 United States Code Annotated, § 213(a)(2), nor did the Act apply with respect to any of its employees who were employed in a local retailing capacity (29 United States Code Annotated, § 213(a) (1) ).

(2) That plaintiffs were "employed in agriculture" while engaged in catching chickens upon the farms of the growers and loading them upon trucks of defendant under provisions of 29 United States Code Annotated, § 213(a) (6).

(3) That as to plaintiff Johnston, who drove defendant's trucks as aforesaid, the Act did not apply because he was an "individual employed within the area of production (as defined by the Administrator) engaged in handling * * * agricultural or horticultural commodities for market," pursuant to 29 United States Code Annotated, § 213(a) (1).

(4) That even if plaintiff Johnston did not come within the agricultural exemption just above referred to, he would not come within the overtime provisions of the Act, 29 United States Code Annotated, § 207, for the reason that he would be considered as an "employee with respect to whom the Interstate Commerce Commission has power to establish the qualifications and maximum hours of service" as exempted by 29 United States Code Annotated, § 213(b) (1).

As the questions of law herein involved are numerous and difficult the facts in the case will be stated in connection with each of the questions of law pertinent thereto, and so the four defenses above referred to will be considered in the same order as above.

---

1. The evidence showed without dispute that Cotton Producers Association sold to Farmers Mutual Exchange wholesale the goods sold in the trade by the latter and it also owned and operated certain processing plants. The two organizations, however, had separate and distinct boards of directors and while officers of Cotton Producers Association cooperated with and advised Farmers Mutual Exchange of Calhoun, Inc., sometimes attending its directors meetings, it exercised no power or control over the latter in connection with its operations, its employment and payment of its employees, the relationship being entirely a debtor-creditor relationship.

(1). As to the defense by Farmers Mutual that it was a retail service establishment and that its employees (or some of them) were employed in a local retailing capacity, the pertinent provisions of the Act are as follows:

"(a) The provisions of sections 6 and 7 shall not apply with respect to * * *

(2) any employee employed by any retail or service establishment, more than 50 per centum of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales or goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry". 29 U.S.C.A. § 213 (a).

There is undisputed evidence in the record that defendant was recognized as a retail establishment in the particular industry involved as required by the above exemption. With the exception of a comparatively small dollar volume of goods disposed of during the critical period for purposes of adjusting its inventory, all of its sales were retail sales, unless in the computation of retail sales there should be considered transactions negotiated and consummated by defendant in behalf of its customers, referred to as growers, to processing plants and others, but it is ruled herein that these sales were really sales by the growers and not by defendant and do not enter this computation. It follows therefore that defendant was in law a retail estab-lishment within the meaning of those words as used in the above exemption. It must next be determined whether it necessarily follows that all its employees were therefore exempt.

It is clear that all of the plaintiffs who were employed in a local retailing capacity were exempt as to such activities, hence we are not concerned with those weeks during which plaintiffs' duties were confined to those services which employees of a retail store serving a rural area would normally perform, such as unloading of merchandise received in freight cars, storing and handling the same, waiting on customers and making retail deliveries.

It would seem that the Administrator himself has taken the position that if the employer defendant is a retail establishment pursuant to 29 United States Code Annotated, § 213(a) (2) then all the employees who, within the meaning of these exemptions, are employed by the establishment are exempted.[2] See also Duncan v. Montgomery Ward & Co., Inc., D.C., 42 F.Supp. 879.

Other duties performed by the plaintiffs, however, in addition to the foregoing, will be next considered.

(2) Did the services of the plaintiffs in connection with catching the chickens, putting them in coops and loading them upon the trucks of the defendant, on the farms of the growers, bring such employees under the provisions of the Fair Labor Standards Act? It would seem that such activities did not do so. The Act provides in part that its provisions shall not apply "with respect to * * * any employee employed in agriculture", 29 United States Code Annotated, § 213(a) (6). It also provides that the term "agriculture" in-

---

2. "It should be noted that the test prescribed in sections 6 and 7 is related to the nature of the employment of the particular *employee*. The criterion used in section 13(a) (2), (3) and (4), on the other hand, is the character of the *establishment* by which the employee is employed. Thus, under sections 6 and 7 some employees of a given employer may be covered and others may not be covered. If, however, the exemption contained in section 13(a) (2), or (3), (4), is applicable to an establishment all the employees who, within the meaning of these exemptions, are 'employed by' that establishment are exempted from sections 6 and 7." Quoted from Sec. 779.3, General Statement of the Administrator.

cludes farming in all its branches and among other things, includes the raising of poultry "and any practices performed by a farmer or on a farm as an incident to * * * such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." See 29 United States Code Annotated, § 203 (f). By the wording of the statute itself it is not required that certain activities to be agricultural must be performed by a farmer, but it is only necessary that the acts in question be "performed * * on a farm as an incident to * * * such farming operations". It seems clear that when a farmer has raised chickens and wishes to market them, catching of the chickens, putting them in coops and loading them on a truck for transportation to market, is an incident to such farming operations. Although the above exemption is contained in a remedial statute and should be construed strictly, it should nevertheless be given due effect if Congress so intended. Compare Damutz v. Wm. Pinchbeck, Inc., 2 Cir., 158 F.2d 882(3), 170 A.L.R. 1246. The mere fact that the farmer, instead of employing his own help to catch and load chickens, procured Farmers Mutual through its employees to do the same, should not defeat the exemption.

Plaintiffs' counsel in this case have contended that Farmers Mutual occupied the relationship of a partner with the growers, but I cannot agree. If, however, Farmers Mutual was in partnership with a grower and engaged in raising poultry it might not change this ruling, for in those circumstances the Farmers Mutual might be itself engaged in agriculture.[3] It is necessary, however, to determine the relationship between Farmers Mutual and the individual growers.

Plaintiff's exhibit No. 8 consists of agreement dated December 28, 1951 between defendant and one Paul Lauterlane which is typical of defendant's methods as of that date. Under this contract defendant furnished the grower (producer) baby chicks and feed at current prices, the producer furnished equipment, labor and facilities; defendant determined the time of sale and the buyer, and when the broilers were sold the producer received the proceeds of sale less amount due defendant. Producer gave defendant a conditional sales contract, retaining title to the chickens and supplies. This contract covered the period December 28, 1951 to June 30, 1952. It is clear that under this contract defendant was a creditor of the grower, reserving to itself power to sell the chickens, pay its account, giving the balance over to the grower as his profit. At a subsequent date these growers contracted, as illustrated by plaintiffs' Exhibit No. 10, in Paragraph 4 thereof, that when the broilers were sold the proceeds would be applied by giving the producer "an amount per pound of marketed broilers, based on the following feed conversion table:

"Between 2.7 and 2.8 lbs. feed to one lb. meat, 3.7¢ per lb.", etc., on a sliding scale—

The contract further provides that the balance of the proceeds would be applied first to retire amounts due by producer to defendant, any amount remaining to be divided equally between them. This second contract differs from the first, in that in effect it rewards efficient operations by the grower, by paying him first on the basis of the relationship of amount of meat produced to the amount of feed consumed, and secondly, allows defendant to participate in the net profits of the venture. However, even this contract cannot be said to create the relationship of partners between defendant and the grower because there is no participation by the grower in any loss resulting from any of these ventures, though there is possibility of profits to both. During at least part of this period defendant in effect made a charge for the catching, loading and hauling of the chickens.

We cannot agree with the contention of defendant's counsel that these plain-

3. Miller Hatcheries, Inc., v. Boyer, 8 Cir., 131 F.2d 283.

tiffs when catching the chickens, were acting as employees of the grower, but that makes no legal difference. Though they were acting under the control and direction of defendant it seems clear they were acting for the benefit of the grower in catching his chickens for him and these services were performed on the farm. This ruling is in accord with interpretations placed upon the Act by the Administrator in his release No. M–13 of March 28, 1947, which states in part: "The handling and cooping of live poultry for market are also within the scope of this exemption." Bearing in mind the consistent and historic policy of Congress to assist the farmers, I cannot conclude that Congress intended to give the farmer this exemption only if he employed his own laborers to catch his chickens, and to deprive him of his exemption merely because he employed an association, such as Farmers Mutual Exchange, to do so. There is no such limitation in the statute.

■ (3) Under some circumstances the plaintiff Johnston might be said to be engaged in commerce, as where the chickens were moving from the farm to a point outside the state via the processing plants, but in the instant case this Court is of the opinion, though it is not necessary to rule, that the chickens were not then moving in interstate commerce for the following reasons:

They were sold by the farmer to the processing plant, they came to rest at the processing plant in their raw or natural state, they remained at the processing plant until they were picked, cleaned, and dressed, then sold and shipped. When delivered at the processing plant they were not consigned to any point outside the state but, on the other hand, the processing plant was the market at which the farmer sold the chickens. In this connection see Walling v. De Soto Creamery & Produce Co., D.C., 51 F. Supp. 938 at page 943.

If, while so transporting the chickens, Johnston was engaged in interstate commerce, then as to the weeks thereby involved defendant might be exempted un-der provisions of Section 13(b) (1) of the Fair Labor Standards Act insofar as his claim for overtime is concerned, unless the exemption as to agricultural products contained in the Motor Common Carriers Act, 49 U.S.C.A. § 303(b) (6), would change the situation. As it is being ruled in this case Johnston was not engaged in interstate commerce no ruling on this question is invoked.

■ This Court is ruling that the employee of a retail feed store having an agreement with a farmer to haul the farmer's chickens from the farm to a processing plant to which the farmer has sold the chickens, there to be cleaned, dressed and shipped in commerce is, while engaged in driving such truck, engaged in the production of goods for Commerce. See Walling v. De Soto Creamery & Produce Co., D.C., 51 F. Supp. 938(4), supra; Fleming v. Atlantic Co., D.C., 40 F.Supp. 654, affirmed Atlantic Co. v. Walling, 5 Cir., 131 F.2d 518; Walling v. Griffin Cartage Co., D.C., 62 F.Supp. 396, affirmed, 6 Cir., 153 F.2d 587.

■ (4) The defendant contends, however, that even though such transportation should be either in commerce or in the production of goods for commerce, nevertheless the defendant is not liable because of the exemption contained in Section 13(a) (10) of the Fair Labor Standards Act, 29 U.S.C.A. § 213 (a) (10), which provides that the Act shall not apply with respect "to any individual employed within the area of production (as defined by the Administrator) engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or * * * dairy products".

Was plaintiff Johnston, in transporting the chickens from the farms to the processing plants "any individual employed within the area of production"? Pursuant to this statute, the Administrator by regulation defined "area of production". In Part 536 of his Rules and Regulations and in Section 536.2 (see 29 U.S.C.A.App.) the Administrator pro-

vided that "an individual shall be regarded as employed in the 'area of production' \* \* \* in handling, packing, storing \* \* \* in their raw or natural state \* \* \* agricultural or horticultural commodities for market \* \* if the establishment where he is employed is located in the open country or in a rural community", and 95% of the commodities on which such operations are performed by the establishment come from normal rural sources of supply located not more than fifty airline miles (in case of poultry processing plants) from the establishment. The terms "open country" or "rural community", it was stated, shall not include any city, town, or urban place of 2500 or greater population. It further provided that the commodity should be considered to come from normal rural sources of supply within specified distances above if they were received from farms within such specified distances.

Under the evidence here, the processing plant at Holly Springs, Georgia, qualifies as one of the exempted establishments under the above regulations, and to that plant Johnston made a number of trips. He also made two trips to a processing plant at Canton, Georgia, and one trip to a processing plant at Lawrenceville, Georgia, neither of these plants qualifying as exempt under the regulation.

The Administrator also issued interpretive bulletin No. 14 explaining the terms "handling of agricultural commodities for market," Section 26 of this bulletin reading as follows:

"26. The operations included in this term appear to be those physical operations customarily performed in obtaining agricultural or horticultural commodities from producers' farms, transporting them to and receiving them at the establishment, weighing them or otherwise determining on what basis the producer is to be paid, placing them in the establishment where further operations are to be performed, and delivering the commodities to ware-houses. Specifically, these operations include loading the commodities on trucks, wagons, etc., in producers' fields or at concentration points, transporting them to the establishment, receiving and unloading them at the establishment, counting or weighing the commodities, assembling, binning, piling, or stacking them in the establishment, moving them from one place to another in the establishment, moving the bags, boxes, cases, barrels, bales, coops, and other loaded containers to wagons, trucks, railroad cars or other conveyances, and transporting the commodities away from the establishment. Since it makes no difference that the employer does not own the goods being handled, the employees of brokers or commission houses who physically handle the goods may be within the exemption."

On March 28, 1947 the Administrator by release No. M–13, provided in effect that the type of exemption under Section 13(a) (10) was concerned with operations on agricultural or horticultural commodities, these being defined as such commodities as they normally come from the farm and before their natural state has been changed. It also stated "the handling of, cooping of, live poultry for market are also within the scope of this exemption." It stated that "operations are considered performed for market if the employer intends to dispose of his commodities in the form in which the particular operations leave them." It stated that "handling" includes those physical operations customarily performed in obtaining poultry or eggs, transporting them to and receiving them at the establishment, weighing them, placing them in the establishment, and delivering them to warehouse or to transportation facilities.

It would seem to follow therefore, that defendant's employee Johnston, in transporting chickens from the farms to the processing plants (said plants being the market as far as the farmer was concerned) was, under the above statute,

regulations and interpretations of the Administrator, "an individual employed within the area of production" (that is to say, within the fifty mile area of the processing plants) and that he was engaged in handling (for this term includes transportation) in their raw or natural state, of agricultural commodities (chickens) for market.

A casual reading of the above regulations adopted by the Administrator may create the impression that the phrase "where employed" means that the person working at the processing plant must be employed by the processing plant in order to be exempt. Slight reflection, however, will dispel such an inference. The word "employed" frequently refers to a person whose services are utilized in furtherance of the business of another, notwithstanding the absence of a technical employer-employee relationship. 14 Words & Phrases, Employed, p. 500, et seq. Where the Administrator used the words "where employed" he evidently meant "where engaged". As stated by Judge Borah in Tobin v. Girard Properties, Inc., 5 Cir., 206 F.2d 524, 527. "It is not important whether the employer * * * is engaged in interstate commerce. It is the work of the employee which is decisive."

It is not necessary to decide whether a different construction of the regulations might render them repugnant to the Act which, in Section 13(a) (10) provides exemption to any individual employed within the area of production engaged in handling agricultural commodities for market.

If, therefore, Johnston's activities while employed in transporting these chickens to the processing plants, will bring him within the Act, so will his employment working at the processing plants, within the area of production, bring him within the exemption.

(5) From the foregoing it appears that Johnston is the only plaintiff in this case whose activities bring him within the Act, and the only activities upon his part not exempt consist of two trips in the truck of Farmers Mutual from local farms to processing plant at Canton, Georgia, and one trip to plant at Lawrenceville, Georgia, neither of these plants being in "open country" or "rural community" as defined by the Administrator. "The weight of authority clearly indicates that when the employee works both in intrastate and interstate commerce, the burden is upon him to point out what part of his work was in intrastate and what part in interstate commerce, and the extent of the interstate work and when performed." See Yearty v. General Wholesale Co., 88 Ga. App. 399, 76 S.E.2d 715, 720, and cases cited, including Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90. The evidence in this case is voluminous and confusing. The Court finds that during each of these three week periods Johnston worked a total of seventy-five hours and from this Finding counsel for plaintiff can make a proper computation as to the amounts due to Johnston for these three weeks, over and above the amounts of wages he received.